# UNITED STATES *v.* PLACE

No. 81–1617.   Argued March 2, 1983—Decided June 20, 1983

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed an opinion concurring in the result, in which MARSHALL, J., joined, *post*, p. 710. BLACKMUN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 720.

*Alan I. Horowitz* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey,* and *John Fichter De Pue.*

*James D. Clark* argued the cause and filed a brief for respondent.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case presents the issue whether the Fourth Amendment prohibits law enforcement authorities from temporarily

---

*\*Fred E. Inbau, Wayne W. Schmidt, James P. Manak, Evelle J. Younger,* and *Howard G. Berringer* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging reversal.

*Richard Emery* and *Charles S. Sims* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

detaining personal luggage for exposure to a trained narcotics detection dog on the basis of reasonable suspicion that the luggage contains narcotics. Given the enforcement problems associated with the detection of narcotics trafficking and the minimal intrusion that a properly limited detention would entail, we conclude that the Fourth Amendment does not prohibit such a detention. On the facts of this case, however, we hold that the police conduct exceeded the bounds of a permissible investigative detention of the luggage.

## I

Respondent Raymond J. Place's behavior aroused the suspicions of law enforcement officers as he waited in line at the Miami International Airport to purchase a ticket to New York's La Guardia Airport. As Place proceeded to the gate for his flight, the agents approached him and requested his airline ticket and some identification. Place complied with the request and consented to a search of the two suitcases he had checked. Because his flight was about to depart, however, the agents decided not to search the luggage.

Prompted by Place's parting remark that he had recognized that they were police, the agents inspected the address tags on the checked luggage and noted discrepancies in the two street addresses. Further investigation revealed that neither address existed and that the telephone number Place had given the airline belonged to a third address on the same street. On the basis of their encounter with Place and this information, the Miami agents called Drug Enforcement Administration (DEA) authorities in New York to relay their information about Place.

Two DEA agents waited for Place at the arrival gate at La Guardia Airport in New York. There again, his behavior aroused the suspicion of the agents. After he had claimed his two bags and called a limousine, the agents decided to approach him. They identified themselves as federal narcotics agents, to which Place responded that he knew they were "cops" and had spotted them as soon as he had deplaned.

One of the agents informed Place that, based on their own observations and information obtained from the Miami authorities, they believed that he might be carrying narcotics. After identifying the bags as belonging to him, Place stated that a number of police at the Miami Airport had surrounded him and searched his baggage. The agents responded that their information was to the contrary. The agents requested and received identification from Place—a New Jersey driver's license, on which the agents later ran a computer check that disclosed no offenses, and his airline ticket receipt. When Place refused to consent to a search of his luggage, one of the agents told him that they were going to take the luggage to a federal judge to try to obtain a search warrant and that Place was free to accompany them. Place declined, but obtained from one of the agents telephone numbers at which the agents could be reached.

The agents then took the bags to Kennedy Airport, where they subjected the bags to a "sniff test" by a trained narcotics detection dog. The dog reacted positively to the smaller of the two bags but ambiguously to the larger bag. Approximately 90 minutes had elapsed since the seizure of respondent's luggage. Because it was late on a Friday afternoon, the agents retained the luggage until Monday morning, when they secured a search warrant from a Magistrate for the smaller bag. Upon opening that bag, the agents discovered 1,125 grams of cocaine.

Place was indicted for possession of cocaine with intent to distribute in violation of 21 U. S. C. § 841(a)(1). In the District Court, Place moved to suppress the contents of the luggage seized from him at La Guardia Airport, claiming that the warrantless seizure of the luggage violated his Fourth Amendment rights.[1] The District Court denied the motion.

---

[1] In support of his motion, respondent also contended that the detention of his person at both the Miami and La Guardia Airports was not based on reasonable suspicion and that the "sniff test" of his luggage was conducted in a manner that tainted the dog's reaction. 498 F. Supp. 1217, 1221, 1228

Applying the standard of *Terry* v. *Ohio*, 392 U. S. 1 (1968), to the detention of personal property, it concluded that detention of the bags could be justified if based on reasonable suspicion to believe that the bags contained narcotics. Finding reasonable suspicion, the District Court held that Place's Fourth Amendment rights were not violated by seizure of the bags by the DEA agents. 498 F. Supp. 1217, 1228 (EDNY 1980). Place pleaded guilty to the possession charge, reserving the right to appeal the denial of his motion to suppress.

On appeal of the conviction, the United States Court of Appeals for the Second Circuit reversed. 660 F. 2d 44 (1981). The majority assumed both that *Terry* principles could be applied to justify a warrantless seizure of baggage on less than probable cause and that reasonable suspicion existed to justify the investigatory stop of Place. The majority concluded, however, that the prolonged seizure of Place's baggage exceeded the permissible limits of a *Terry*-type investigative stop and consequently amounted to a seizure without probable cause in violation of the Fourth Amendment.

We granted certiorari, 457 U. S. 1104 (1982), and now affirm.

II

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, *and effects*, against unreasonable searches and seizures." (Emphasis added.) Although in the context of personal property, and particularly containers, the Fourth Amendment challenge is

---

(EDNY 1980). The District Court rejected both contentions. As to the former, it concluded that the agents had reasonable suspicion to believe that Place was engaged in criminal activity when he was detained at the two airports and that the stops were therefore lawful. *Id.*, at 1225, 1226. On appeal, the Court of Appeals did not reach this issue, assuming the existence of reasonable suspicion. Respondent Place cross-petitioned in this Court on the issue of reasonable suspicion, and we denied certiorari. *Place* v. *United States*, 457 U. S. 1106 (1982). We therefore have no occasion to address the issue here.

typically to the subsequent search of the container rather than to its initial seizure by the authorities, our cases reveal some general principles regarding seizures. In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.[2] See, *e. g.*, *Marron* v. *United States*, 275 U. S. 192, 196 (1927). Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present. See, *e. g.*, *Arkansas* v. *Sanders*, 442 U. S. 753, 761 (1979); *United States* v. *Chadwick*, 433 U. S. 1 (1977); *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971).[3] For example, "objects such as weapons or contraband found in a public place may be seized by the police without a warrant," *Payton* v. *New York*, 445 U. S. 573, 587 (1980), because, under these circumstances, the risk of the item's disappearance or use for its intended purpose before a

---

[2] The Warrant Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[3] In *Sanders*, the Court explained:

"The police acted properly—indeed commendably—in apprehending respondent and his luggage. They had ample probable cause to believe that respondent's green suitcase contained marihuana. . . . Having probable cause to believe that contraband was being driven away in the taxi, the police were justified in stopping the vehicle . . . and seizing the suitcase they suspected contained contraband." 442 U. S., at 761.

The Court went on to hold that the police violated the Fourth Amendment in immediately searching the luggage rather than first obtaining a warrant authorizing the search. *Id.*, at 766. That holding was not affected by our recent decision in *United States* v. *Ross*, 456 U. S. 798, 824 (1982).

warrant may be obtained outweighs the interest in possession. See also *G. M. Leasing Corp.* v. *United States,* 429 U. S. 338, 354 (1977).

In this case, the Government asks us to recognize the reasonableness under the Fourth Amendment of warrantless seizures of personal luggage from the custody of the owner on the basis of less than probable cause, for the purpose of pursuing a limited course of investigation, short of opening the luggage, that would quickly confirm or dispel the authorities' suspicion. Specifically, we are asked to apply the principles of *Terry* v. *Ohio, supra,* to permit such seizures on the basis of reasonable, articulable suspicion, premised on objective facts, that the luggage contains contraband or evidence of a crime. In our view, such application is appropriate.

In *Terry* the Court first recognized "the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." *Michigan* v. *Summers,* 452 U. S. 692, 698 (1981). In approving the limited search for weapons, or "frisk," of an individual the police reasonably believed to be armed and dangerous, the Court implicitly acknowledged the authority of the police to make a *forcible stop* of a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity. 392 U. S., at 22.[4] That implicit proposition was embraced openly in *Adams* v. *Williams,* 407 U. S. 143, 146 (1972), where the Court relied on *Terry* to hold that the police officer lawfully made a forcible stop of the suspect to investigate an informant's tip that the suspect was carry-

---

[4] In his concurring opinion in *Terry,* Justice Harlan made this logical underpinning of the Court's Fourth Amendment holding clear:

"In the first place, if the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop. . . . I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime." 392 U. S., at 32–33.

ing narcotics and a concealed weapon. See also *Michigan* v. *Summers, supra* (limited detention of occupants while authorities search premises pursuant to valid search warrant); *United States* v. *Cortez*, 449 U. S. 411 (1981) (stop near border of vehicle suspected of transporting illegal aliens); *United States* v. *Brignoni-Ponce*, 422 U. S. 873 (1975) (brief investigative stop near border for questioning about citizenship and immigration status).

The exception to the probable-cause requirement for limited seizures of the person recognized in *Terry* and its progeny rests on a balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of "the Fourth Amendment's general proscription against unreasonable searches and seizures." 392 U. S., at 20. We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.

We examine first the governmental interest offered as a justification for a brief seizure of luggage from the suspect's custody for the purpose of pursuing a limited course of investigation. The Government contends that, where the authorities possess specific and articulable facts warranting a reasonable belief that a traveler's luggage contains narcotics, the governmental interest in seizing the luggage briefly to pursue further investigation is substantial. We agree. As observed in *United States* v. *Mendenhall*, 446 U. S. 544, 561 (1980) (opinion of POWELL, J.), "[t]he public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit."

Respondent suggests that, absent some special law enforcement interest such as officer safety, a generalized interest in law enforcement cannot justify an intrusion on an individual's Fourth Amendment interests in the absence of

probable cause. Our prior cases, however, do not support this proposition. In *Terry*, we described the governmental interests supporting the initial seizure of the person as "effective crime prevention and detection; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U. S., at 22. Similarly, in *Michigan* v. *Summers* we identified three law enforcement interests that justified limited detention of the occupants of the premises during execution of a valid search warrant: "preventing flight in the event that incriminating evidence is found," "minimizing the risk ·of harm" both to the officers and the occupants, and "orderly completion of the search." 452 U. S., at 702–703. Cf. *Florida* v. *Royer*, 460 U. S. 491, 500 (1983) (plurality opinion) ("The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect"). The test is whether those interests are sufficiently "substantial," 452 U. S., at 699, not whether they are independent of the interest in investigating crimes effectively and apprehending suspects. The context of a particular law enforcement practice, of course, may affect the determination whether a brief intrusion on Fourth Amendment interests on less than probable cause is essential to effective criminal investigation. Because of the inherently transient nature of drug courier activity at airports, allowing police to make brief investigative stops of persons at airports on reasonable suspicion of drug-trafficking substantially enhances the likelihood that police will be able to prevent the flow of narcotics into distribution channels.[5]

---

[5] Referring to the problem of intercepting drug couriers in the Nation's airports, JUSTICE POWELL has observed:

"Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs . . . may be easily concealed. As a result, the obstacles to detection of

Against this strong governmental interest, we must weigh the nature and extent of the intrusion upon the individual's Fourth Amendment rights when the police briefly detain luggage for limited investigative purposes. On this point, respondent Place urges that the rationale for a *Terry* stop of the person is wholly inapplicable to investigative detentions of personalty. Specifically, the *Terry* exception to the probable-cause requirement is premised on the notion that a *Terry*-type stop of the person is substantially less intrusive of a person's liberty interests than a formal arrest. In the property context, however, Place urges, there are no degrees of intrusion. Once the owner's property is seized, the dispossession is absolute.

We disagree. The intrusion on possessory interests occasioned by a seizure of one's personal effects can vary both in its nature and extent. The seizure may be made after the owner has relinquished control of the property to a third party or, as here, from the immediate custody and control of the owner.[6] Moreover, the police may confine their investi-

---

illegal conduct may be unmatched in any other area of law enforcement." *United States* v. *Mendenhall*, 446 U. S. 544, 561–562 (1980).

See *Florida* v. *Royer*, 460 U. S. 491, 519 (1983) (BLACKMUN, J., dissenting) ("The special need for flexibility in uncovering illicit drug couriers is hardly debatable") (airport context).

[6] One need only compare the facts of this case with those in *United States* v. *Van Leeuwen*, 397 U. S. 249 (1970). There the defendant had voluntarily relinquished two packages of coins to the postal authorities. Several facts aroused the suspicion of the postal officials, who detained the packages, without searching them, for about 29 hours while certain lines of inquiry were pursued. The information obtained during this time was sufficient to give the authorities probable cause to believe that the packages contained counterfeit coins. After obtaining a warrant, the authorities opened the packages, found counterfeit coins therein, resealed the packages, and sent them on their way. Expressly limiting its holding to the facts of the case, the Court concluded that the 29-hour detention of the packages on reasonable suspicion that they contained contraband did not violate the Fourth Amendment. *Id.*, at 253.

As one commentator has noted, "*Van Leeuwen* was an easy case for the Court because the defendant was unable to show that the invasion intruded

gation to an on-the-spot inquiry—for example, immediate exposure of the luggage to a trained narcotics detection dog[7]— or transport the property to another location.   Given the fact that seizures of property can vary in intrusiveness, some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime.

In sum, we conclude that when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.

The purpose for which respondent's luggage was seized, of course, was to arrange its exposure to a narcotics detection dog.   Obviously, if this investigative procedure is itself a search requiring probable cause, the initial seizure of respondent's luggage for the purpose of subjecting it to the sniff test—no matter how brief—could not be justified on less than probable cause.   See *Terry* v. *Ohio*, 392 U. S., at 20; *United States* v. *Cortez*, 449 U. S., at 421; *United States* v. *Brignoni-Ponce*, 422 U. S., at 881–882; *Adams* v. *Williams*, 407 U. S., at 146.

The Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations

---

upon either a privacy interest in the contents of the packages or a possessory interest in the packages themselves." 3 W. LaFave, Search and Seizure § 9.6, p. 71 (Supp. 1982).

[7] Cf. *Florida* v. *Royer, supra,* at 502 (plurality opinion) ("We agree with the State that [the officers had] adequate grounds for suspecting Royer of carrying drugs and for temporarily detaining him *and his luggage* while they attempted to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention") (emphasis added).

of privacy." *United States* v. *Chadwick*, 433 U. S., at 7. We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. *Id.*, at 13. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a "search" within the meaning of the Fourth Amendment.

## III

There is no doubt that the agents made a "seizure" of Place's luggage for purposes of the Fourth Amendment when, following his refusal to consent to a search, the agent told Place that he was going to take the luggage to a federal judge to secure issuance of a warrant. As we observed in *Terry*, "[t]he manner in which the seizure . . . [was] con-

ducted is, of course, as vital a part of the inquiry as whether [it was] warranted at all." 392 U. S., at 28. We therefore examine whether the agents' conduct in this case was such as to place the seizure within the general rule requiring probable cause for a seizure or within *Terry*'s exception to that rule.

At the outset, we must reject the Government's suggestion that the point at which probable cause for seizure of luggage from the person's presence becomes necessary is more distant than in the case of a *Terry* stop of the person himself. The premise of the Government's argument is that seizures of property are generally less intrusive than seizures of the person. While true in some circumstances, that premise is faulty on the facts we address in this case. The precise type of detention we confront here is seizure of personal luggage from the immediate possession of the suspect for the purpose of arranging exposure to a narcotics detection dog. Particularly in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of a custodial confinement or to the public indignity of being personally detained. Nevertheless, such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return.[8] Therefore, when the police seize luggage from the

---

[8] "At least when the authorities do not make it absolutely clear how they plan to reunite the suspect and his possessions at some future time and place, seizure of the object is tantamount to seizure of the person. This is because that person must either remain on the scene or else seemingly surrender his effects permanently to the police." 3 W. LaFave, Search and Seizure § 9.6, p. 72 (Supp. 1982).

suspect's custody, we think the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause. Under this standard, it is clear that the police conduct here exceeded the permissible limits of a *Terry*-type investigative stop.

The length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause. Although we have recognized the reasonableness of seizures longer than the momentary ones involved in *Terry, Adams,* and *Brignoni-Ponce,* see *Michigan* v. *Summers,* 452 U. S. 692 (1981), the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion. Moreover, in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation. We note that here the New York agents knew the time of Place's scheduled arrival at La Guardia, had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on respondent's Fourth Amendment interests.[9] Thus, although we decline to adopt any outside time limitation for a permissible *Terry* stop,[10] we have never

---

[9] Cf. *Florida* v. *Royer,* 460 U. S., at 506 (plurality opinion) ("If [trained narcotics detection dogs] had been used, Royer and his luggage could have been momentarily detained while this investigative procedure was carried out"). This course of conduct also would have avoided the further substantial intrusion on respondent's possessory interests caused by the removal of his luggage to another location.

[10] Cf. ALI, Model Code of Pre-Arraignment Procedure § 110.2(1) (1975) (recommending a maximum of 20 minutes for a *Terry* stop). We understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.

approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case. See *Dunaway* v. *New York*, 442 U. S. 200 (1979).

Although the 90-minute detention of respondent's luggage is sufficient to render the seizure unreasonable, the violation was exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion. In short, we hold that the detention of respondent's luggage in this case went beyond the narrow authority possessed by police to detain briefly luggage reasonably suspected to contain narcotics.

## IV

We conclude that, under all of the circumstances of this case, the seizure of respondent's luggage was unreasonable under the Fourth Amendment. Consequently, the evidence obtained from the subsequent search of his luggage was inadmissible, and Place's conviction must be reversed. The judgment of the Court of Appeals, accordingly, is affirmed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in the result.

In this case, the Court of Appeals assumed both that the officers had the "reasonable suspicion" necessary to justify an "investigative" stop of respondent under *Terry* v. *Ohio*, 392 U. S. 1 (1968), and its progeny, and that the principles of *Terry* apply to seizures of property. See 660 F. 2d 44, 50 (CA2 1981); *ante,* at 700. The court held simply that "the prolonged seizure of [respondent's] baggage went far beyond a mere investigative stop and amounted to a violation of his Fourth Amendment rights." 660 F. 2d, at 50. See also *id.,*

at 52, 53. I would affirm the Court of Appeals' judgment on this ground.

Instead of simply affirming on this ground and putting an end to the matter, the Court decides to reach, and purportedly to resolve, the constitutionality of the seizure of respondent's luggage on less than probable cause and the exposure of that luggage to a narcotics detection dog. See *ante*, at 706–707. Apparently, the Court finds itself unable to "resist the pull to decide the constitutional issues involved in this case on a broader basis than the record before [it] imperatively requires." *Street* v. *New York*, 394 U. S. 576, 581 (1969). Because the Court reaches issues unnecessary to its judgment and because I cannot subscribe to the Court's analysis of those issues, I concur only in the result.

# I

I have had occasion twice in recent months to discuss the limited scope of the exception to the Fourth Amendment's probable-cause requirement created by *Terry* and its progeny. See *Florida* v. *Royer*, 460 U. S. 491, 509 (1983) (BRENNAN, J., concurring in result); *Kolender* v. *Lawson*, 461 U. S. 352, 362 (1983) (BRENNAN, J., concurring). Unfortunately, the unwarranted expansion of that exception which the Court endorses today forces me to elaborate on my previously expressed views.

In *Terry* the Court expressly declined to address "the constitutional propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation." 392 U. S., at 19, n. 16.[1] The Court was con-

---

[1] The "seizure" at issue in *Terry* v. *Ohio* was the actual physical restraint imposed on the suspect. 392 U. S., at 19. The Court assumed that the officer's initial approach and questioning of the suspect did not amount to a "seizure." *Id.*, at 19, n. 16. The Court acknowledged, however, that "seizures" may occur irrespective of the imposition of actual physical restraint. The Court stated that "[i]t must be recognized that whenever a police officer accosts an individual and restrains his freedom to

fronted with "the quite narrow question" of "whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons unless there is probable cause for an arrest." *Id.*, at 15. In addressing this question, the Court noted that it was dealing "with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Id.*, at 20. As a result, the conduct involved in the case had to be "tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Ibid.* (footnote omitted). The Court's inquiry into the "reasonableness" of the conduct at issue was based on a "'balancing [of] the need to search [or seize] against the invasion which the search [or seizure] entails.'" *Id.*, at 21, quoting *Camara* v. *Municipal Court*, 387 U. S. 523, 537 (1967). The Court concluded that the officer's conduct was reasonable and stated its holding as follows:

> "We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of

walk away, he has 'seized' that person." *Id.*, at 16. See also *id.*, at 19, n. 16. This standard, however, is easier to state than it is to apply. Compare *United States* v. *Mendenhall*, 446 U. S. 544, 550–557 (1980) (opinion of Stewart, J.), with *Florida* v. *Royer*, 460 U. S. 491, 511–512 (1983) (BRENNAN, J., concurring in result).

the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." 392 U. S., at 30.

In *Adams* v. *Williams*, 407 U. S. 143 (1972), the Court relied on *Terry* to endorse "brief" investigative stops based on reasonable suspicion. 407 U. S., at 145–146. In this regard, the Court stated that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.*, at 146. The weapons search upheld in *Adams* was very limited and was based on *Terry*'s safety rationale. 407 U. S., at 146. The Court stated that the purpose of a "limited" weapons search "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. . . ." *Ibid.*

In *United States* v. *Brignoni-Ponce*, 422 U. S. 873 (1975), the Court relied on *Terry* and *Adams* in holding that "when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." 422 U. S., at 881.[2] The Court based this relaxation of the traditional probable-cause requirement on the importance of the governmental interest in stemming the flow of illegal aliens, on the minimal intrusion of a brief stop, and on the absence of practical alternatives for policing the border. *Ibid.* The Court noted the limited holdings of *Terry* and *Adams* and while authorizing the police to "question the driver and passengers about their citizenship and immigration status, and . . . ask them to explain suspicious circumstances," the Court expressly stated that "any further detention or search must be based on consent or probable cause." 422 U. S., at 881–882. See also

---

[2] The stops "'usually consume[d] no more than a minute.'" *United States* v. *Brignoni-Ponce*, 422 U. S., at 880.

*Ybarra* v. *Illinois,* 444 U. S. 85, 93 (1979) ("The *Terry* case created an exception to the requirement of probable cause, an exception whose 'narrow scope' this Court 'has been careful to maintain'" (footnote omitted)); *Dunaway* v. *New York,* 442 U. S. 200, 209–212 (1979) (discussing the narrow scope of *Terry* and its progeny).[3]

It is clear that *Terry,* and the cases that followed it, permit only brief investigative stops and extremely limited searches based on reasonable suspicion. They do not provide the police with a commission to employ whatever investigative techniques they deem appropriate. As I stated in *Florida* v. *Royer,* "[t]he scope of a *Terry*-type 'investigative' stop and any attendant search must be extremely limited or the *Terry* exception would 'swallow the general rule that Fourth Amendment seizures [and searches] are "reasonable" only if based on probable cause.'" 460 U. S., at 510 (concurring in result), quoting *Dunaway* v. *New York, supra,* at 213.

## II

In some respects the Court's opinion in this case can be seen as the logical successor of the plurality opinion in *Florida* v. *Royer, supra.* The plurality opinion in *Royer* contained considerable language which was unnecessary to the judgment, *id.,* at 509 (BRENNAN, J., concurring in result), regarding the permissible scope of *Terry* investigative stops. See 460 U. S., at 501–507, and n. 10. Even assuming, however, that the Court finds some support in *Royer* for its discussion of the scope of *Terry* stops, the Court today goes

---

[3] In *Michigan* v. *Summers,* 452 U. S. 692 (1981), the Court relied on *Terry* and its progeny to hold that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U. S., at 705 (footnotes omitted). The Court also relied on *Terry* in *Pennsylvania* v. *Mimms,* 434 U. S. 106 (1977), to uphold an officer's order to an individual to get out of his car following a lawful stop of the vehicle. Both *Summers* and *Mimms* focused on seizures of people.

well beyond *Royer* in endorsing the notion that the principles of *Terry* permit "warrantless seizures of personal luggage from the custody of the owner on the basis of less than probable cause, for the purpose of pursuing a limited course of investigation, short of opening the luggage, that would quickly confirm or dispel the authorities' suspicion." *Ante,* at 702. See also *ante,* at 706. In addition to being unnecessary to the Court's judgment, see *supra,* at 711, this suggestion finds no support in *Terry* or its progeny and significantly dilutes the Fourth Amendment's protections against government interference with personal property. In short, it represents a radical departure from settled Fourth Amendment principles.

As noted *supra,* at 711–712, *Terry* and the cases that followed it authorize a brief "investigative" stop of an individual based on reasonable suspicion and a limited search for weapons if the officer reasonably suspects that the individual is armed and presently dangerous. The purpose of this brief stop is "to determine [the individual's] identity or to maintain the status quo momentarily while obtaining more information. . . ." *Adams* v. *Williams,* 407 U. S., at 146. Anything more than a brief stop "must be based on consent or probable cause." *United States* v. *Brignoni-Ponce, supra,* at 882. During the course of this stop, "the suspect must not be moved or asked to move more than a short distance; physical searches are permitted only to the extent necessary to protect the police officers involved during the encounter; and, most importantly, the suspect must be free to leave after a short time and to decline to answer the questions put to him." *Kolender* v. *Lawson,* 461 U. S., at 365 (BRENNAN, J., concurring). It is true that *Terry* stops may involve seizures of personal effects incidental to the seizure of the person involved. Obviously, an officer cannot seize a person without also seizing the personal effects that the individual has in his possession at the time. But there is a difference between

incidental seizures of personal effects and seizures of property independent of the seizure of the person.

The Fourth Amendment protects "effects" as well as people from unreasonable searches and seizures. In this regard, JUSTICE STEVENS pointed out in *Texas* v. *Brown*, 460 U. S. 730 (1983), that "[t]he [Fourth] Amendment protects two different interests of the citizen—the interest in retaining possession of property and the interest in maintaining personal privacy." *Id.*, at 747 (opinion concurring in judgment). "A seizure threatens the former, a search the latter." *Ibid.* Even if an item is not searched, therefore, its seizure implicates a protected Fourth Amendment interest. For this reason, seizures of property must be based on probable cause. See *Colorado* v. *Bannister*, 449 U. S. 1, 3 (1980); *Payton* v. *New York*, 445 U. S. 573, 587 (1980); *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 351 (1977); *Chambers* v. *Maroney*, 399 U. S. 42, 51–52 (1970); *Warden* v. *Hayden*, 387 U. S. 294, 309–310 (1967). See also *Texas* v. *Brown*, *supra*, at 747–748 (STEVENS, J., concurring in judgment). Neither *Terry* nor its progeny changed this rule.

In this case, the officers' seizure of respondent and their later independent seizure of his luggage implicated separate Fourth Amendment interests. First, respondent had a protected interest in maintaining his personal security and privacy. *Terry* allows this interest to be overcome, and authorizes a limited intrusion, if the officers have reason to suspect that criminal activity is afoot. Second, respondent had a protected interest in retaining possession of his personal effects. While *Terry* may authorize seizures of personal effects incident to a lawful seizure of the person, nothing in the *Terry* line of cases authorizes the police to seize personal property, such as luggage, independent of the seizure of the person. Such seizures significantly expand the scope of a *Terry* stop and may not be effected on less than probable

cause.[4]    Obviously, they also significantly expand the scope of the intrusion.

The officers did not develop probable cause to arrest respondent during their encounter with him.    See 660 F. 2d, at 50.    Therefore, they had to let him go.    But despite the absence of probable cause to arrest respondent, the officers seized his luggage and deprived him of possession.    Respondent, therefore, was subjected not only to an invasion of his personal security and privacy, but also to an independent dispossession of his personal effects based simply on reasonable suspicion.    It is difficult to understand how this intrusion is not more severe than a brief stop for questioning or even a limited, on-the-spot patdown search for weapons.

In my view, as soon as the officers seized respondent's luggage, independent of their seizure of him, they exceeded the scope of a permissible *Terry* stop and violated respondent's Fourth Amendment rights.    In addition, the officers' seizure of respondent's luggage violated the established rule that seizures of personal effects must be based on probable cause. Their actions, therefore, should not be upheld.

The Court acknowledges that seizures of personal property must be based on probable cause.    See *ante,* at 700–702. Despite this recognition, the Court employs a balancing test drawn from *Terry* to conclude that personal effects may be seized based on reasonable suspicion.    See *ante,* at 703–706.[5]

---

[4] Putting aside the legality of the independent seizure of the luggage, the Court correctly points out that the seizure of luggage "can effectively restrain the person" beyond the initial stop "since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return."    *Ante,* at 708 (footnote omitted).

[5] To the extent that the Court relies on *United States* v. *Van Leeuwen,* 397 U. S. 249 (1970), as support for its conclusion, see *ante,* at 705–706, n. 6, such reliance is misplaced.    As the Court itself points out, the holding in *Van Leeuwen* was expressly limited to the facts of that case.    *Ante,* at 705, n. 6.    Moreover, the Court of Appeals more than adequately distin-

In *Dunaway* v. *New York*, 442 U. S. 200 (1979), the Court stated that "[t]he narrow intrusions involved in [*Terry* and its progeny] were judged by a balancing test rather than by the general principle that Fourth Amendment seizures must be supported by the 'long-prevailing standards' of probable cause . . . only because these intrusions fell far short of the kind of intrusion associated with an arrest." *Id.*, at 212. As *Dunaway* suggests, the use of a balancing test in this case is inappropriate. First, the intrusion involved in this case is no longer the "narrow" one contemplated by the *Terry* line of cases. See *supra*, at 717. In addition, the intrusion involved in this case involves not only the seizure of a person, but also the seizure of property. As noted, *supra*, at 711–712, *Terry* and its progeny did not address seizures of property. Those cases left unchanged the rule that seizures of property must be based on probable cause. See *supra*, at 716–717. The *Terry* balancing test should not be wrenched from its factual and conceptual moorings.

There are important reasons why balancing inquiries should not be conducted except in the most limited circumstances. *Terry* and the cases that followed it established "isolated exceptions to the general rule that the Fourth Amendment itself has already performed the constitutional balance between police objectives and personal privacy." *Michigan* v. *Summers*, 452 U. S. 692, 706 (1981) (Stewart, J., dissenting). "[T]he protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the 'often competitive enterprise of ferreting out crime.'" *Dunaway* v. *New York*,

---

guished *Van Leeuwen*. See 660 F. 2d 44, 52–53 (CA2 1981). As the court stated: "Unlike the dispossession of hand baggage in a passenger's custody, which constitutes a substantial intrusion, the mere detention of mail not in his custody or control amounts to at most a minimal or technical interference with his person or effects, resulting in no personal deprivation at all." *Ibid.*

*supra*, at 213, quoting *Johnson* v. *United States*, 333 U. S. 10, 14 (1948). The truth of this proposition is apparent when one considers that the Court today has employed a balancing test "to swallow the general rule that [seizures of property] are 'reasonable' only if based on probable cause." 442 U. S., at 213. JUSTICE BLACKMUN's concern over "an emerging tendency on the part of the Court to convert the *Terry* decision into a general statement that the Fourth Amendment requires only that any seizure be reasonable," *post*, at 721 (BLACKMUN, J., concurring in judgment) (footnote omitted), · is certainly justified.

## III

The Court also suggests today, in a discussion unnecessary to the judgment, that exposure of respondent's luggage to a narcotics detection dog "did not constitute a 'search' within the meaning of the Fourth Amendment." *Ante*, at 707. In the District Court, respondent did "not contest the validity of sniff searches *per se*. . . ." 498 F. Supp. 1217, 1228 (EDNY 1980). The Court of Appeals did not reach or discuss the issue. It was not briefed or argued in this Court. In short, I agree with JUSTICE BLACKMUN that the Court should not address the issue. See *post*, at 723–724 (BLACKMUN, J., concurring in judgment).

I also agree with JUSTICE BLACKMUN's suggestion, *ibid.*, that the issue is more complex than the Court's discussion would lead one to believe. As JUSTICE STEVENS suggested in objecting to "unnecessarily broad dicta" in *United States* v. *Knotts*, 460 U. S. 276 (1983), the use of electronic detection techniques that enhance human perception implicates "especially sensitive concerns." *Id.*, at 288 (opinion concurring in judgment). Obviously, a narcotics detection dog is not an electronic detection device. Unlike the electronic "beeper" in *Knotts*, however, a dog does more than merely allow the police to do more efficiently what they could do using only their own senses. A dog adds a new and previously unobtainable dimension to human perception. The use of dogs, therefore, represents a greater intrusion into an individual's

privacy. Such use implicates concerns that are at least as sensitive as those implicated by the use of certain electronic detection devices. Cf. *Katz* v. *United States*, 389 U. S. 347 (1967).

I have expressed the view that dog sniffs of people constitute searches. See *Doe* v. *Renfrow*, 451 U. S. 1022, 1025–1026 (1981) (BRENNAN, J., dissenting from denial of certiorari). In *Doe*, I suggested that sniffs of inanimate objects might present a different case. *Id.*, at 1026, n. 4. In any event, I would leave the determination of whether dog sniffs of luggage amount to searches, and the subsidiary question of what standards should govern such intrusions, to a future case providing an appropriate, and more informed, basis for deciding these questions.

## IV

Justice Douglas was the only dissenter in *Terry*. He stated that "[t]here have been powerful hydraulic pressures throughout our history that bear heavily on the Court to water down constitutional guarantees and give the police the upper hand." 392 U. S., at 39 (dissenting opinion). Today, the Court uses *Terry* as a justification for submitting to these pressures. Their strength is apparent, for even when the Court finds that an individual's Fourth Amendment rights have been violated it cannot resist the temptation to weaken the protections the Amendment affords.

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL joins, concurring in the judgment.

For me, the Court's analysis in Part III of its opinion is quite sufficient to support its judgment. I agree that on the facts of this case, the detention of Place's luggage amounted to, and was functionally identical with, a seizure of his person. My concern with the Court's opinion has to do (a) with its general discussion in Part II of seizures of luggage under the *Terry* v. *Ohio*, 392 U. S. 1 (1968), exception to the war-

rant and probable-cause requirements, and (b) with the Court's haste to resolve the dog-sniff issue.

## I

In providing guidance to other courts, we often include in our opinions material that, technically, constitutes dictum. I cannot fault the Court's desire to set guidelines for *Terry* seizures of luggage based on reasonable suspicion. I am concerned, however, with what appears to me to be an emerging tendency on the part of the Court to convert the *Terry* decision into a general statement that the Fourth Amendment requires only that any seizure be reasonable.[1]

I pointed out in dissent in *Florida* v. *Royer*, 460 U. S. 491, 513 (1983), that our prior cases suggest a two-step evaluation of seizures under the Fourth Amendment. The Amendment generally prohibits a seizure unless it is pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized. See *ante*, at 701; *Florida* v. *Royer*, 460 U. S., at 514 (dissenting opinion). The Court correctly observes that a warrant may be dispensed with if the officer has probable cause and if some exception to the warrant requirement, such as exigent cir-

[1] The Court states that the applicability of the *Terry* exception "rests on a balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of 'the Fourth Amendment's general proscription against unreasonable searches and seizures.'" *Ante*, at 703, quoting *Terry*, 392 U. S., at 20. As the context of the quotation from *Terry* makes clear, however, this balancing to determine reasonableness occurs only under the exceptional circumstances that justify the *Terry* exception:

"But we deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Ibid.*

cumstances, is applicable. *Ante*, at 701. While the Fourth Amendment speaks in terms of freedom from unreasonable seizures, the Amendment does not leave the reasonableness of most seizures to the judgment of courts or government officers: the Framers of the Amendment balanced the interests involved and decided that a seizure is reasonable only if supported by a judicial warrant based on probable cause. See *Texas* v. *Brown*, 460 U. S. 730, 744–745 (1983) (POWELL, J., concurring); *United States* v. *Rabinowitz*, 339 U. S. 56, 70 (1950) (Frankfurter, J., dissenting).

*Terry* v. *Ohio*, however, teaches that in some circumstances a limited seizure that is less restrictive than a formal arrest may constitutionally occur upon mere reasonable suspicion, if "supported by a special law enforcement need for greater flexibility." *Florida* v. *Royer*, 460 U. S., at 514 (dissenting opinion). See *Michigan* v. *Summers*, 452 U. S. 692, 700 (1981). When this exception to the Fourth Amendment's warrant and probable-cause requirements is applicable, a reviewing court must balance the individual's interest in privacy against the government's law enforcement interest and determine whether the seizure was reasonable under the circumstances. *Id.*, at 699–701. Only in this limited context is a court entitled to engage in any balancing of interests in determining the validity of a seizure.

Because I agree with the Court that there is a significant law enforcement interest in interdicting illegal drug traffic in the Nation's airports, *ante*, at 704; see *Florida* v. *Royer*, 460 U. S., at 513, 519 (dissenting opinion), a limited intrusion caused by a temporary seizure of luggage for investigative purposes could fall within the *Terry* exception. The critical threshold issue is the intrusiveness of the seizure.[2] In this

---

[2] I cannot agree with the Court's assertion that the diligence of the police in acting on their suspicion is relevant to the extent of the intrusion on Fourth Amendment interests. See *ante*, at 709–710. It makes little difference to a traveler whose luggage is seized whether the police conscientiously followed a lead or bungled the investigation. The duration and intrusiveness of the seizure is not altered by the diligence the police ex-

case, the seizure went well beyond a minimal intrusion and therefore cannot fall within the *Terry* exception.

## II

The Court's resolution of the status of dog sniffs under the Fourth Amendment is troubling for a different reason. The District Court expressly observed that Place "does not contest the validity of sniff searches *per se.*" 498 F. Supp. 1217, 1228 (EDNY 1980).[3] While Place may have possessed such a claim, he chose not to raise it in that court. The issue also was not presented to or decided by the Court of Appeals. Moreover, contrary to the Court's apparent intimation, *ante*, at 706, an answer to the question is not necessary to the decision. For the purposes of this case, the precise nature of the legitimate investigative activity is irrelevant. Regardless of the validity of a dog sniff under the Fourth Amendment, the seizure was too intrusive. The Court has no need to decide the issue here.

As a matter of prudence, decision of the issue is also unwise. While the Court has adopted one plausible analysis of the issue, there are others. For example, a dog sniff may be a search, but a minimally intrusive one that could be justified in this situation under *Terry* upon mere reasonable suspicion. Neither party has had an opportunity to brief the issue, and the Court grasps for the appropriate analysis of the problem. Although it is not essential that the Court ever adopt the views of one of the parties, it should not decide an issue on which neither party has expressed any opinion at all. The Court is certainly in no position to consider all the ramifica-

---

ercise. Of course, diligence may be relevant to a court's determination of the reasonableness of the seizure once it is determined that the seizure is sufficiently nonintrusive as to be eligible for the *Terry* exception.

[3] The District Court did hold that the dog sniff was not conducted in a fashion that under the circumstances was "reasonably calculated to achieve a tainted reaction from the dog." 498 F. Supp., at 1228. This, however, is a due process claim, not one under the Fourth Amendment. Place apparently did not raise this issue before the Court of Appeals.

tions of this important issue. Certiorari is currently pending in two cases that present the issue directly. *United States* v. *Beale,* No. 82–674; *Waltzer* v. *United States,* No. 82–5491. There is no reason to avoid a full airing of the issue in a proper case.

For the foregoing reasons, I concur only in the judgment of the Court.