STATE OF NORTH CAROLINA v. ROBERT JOHN DARACK

No. 831SC575

(Filed 21 February 1984)

**Searches and Seizures § 12— denial of motion to suppress evidence—findings of fact supported by evidence**

The detention of defendant and his airplane until a dog trained in the detection of narcotics signified the presence of controlled substances in the airplane was not an unreasonable seizure, and a subsequent search of the airplane under a warrant and the seizure of marijuana found therein were lawful, where the evidence tended to show that defendant landed his plane at the Manteo Airport, an uncontrolled airport, in the predawn hours; the airport is in close proximity to the open ocean; the defendant gave evasive or uncertain answers regarding the registration of the aircraft; there was an absence of any severe weather conditions which would have forced defendant to land; the defendant taxied around the airport for some ten minutes before shutting off his engines; defendant gave the appearance of being lost; the airplane's rear windows were covered; the airplane appeared to be loaded with cargo up to the pilot's seat; the defendant answered that it contained only personal effects and baggage and nothing else of value; the defendant's path of travel was from somewhere in the south Atlantic states by way of a stop at Myrtle Beach, South Carolina, to the northern part of the United States; the defendant's flight pattern was consistent with the usual pattern of aircraft carrying illegal drugs; there was information from the U.S. Customs Office that defendant was a suspect in cocaine smuggling in Florida in October 1981 and was then believed armed and dangerous; the defendant's use of the airplane was not readily traceable as to either actual ownership or name of the individuals who put defendant in possession; the defendant only purchased fuel at Myrtle Beach and did not tie down there as he had said; and a trained agent gave an opinion that the defendant and airplane fitted a smuggling profile.

APPEAL by defendant from *Winberry* and *Stevens, Judges.* Judgment entered 10 February 1983 in Superior Court, DARE County. Heard in the Court of Appeals 10 January 1984.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Archie W. Anders, for the State.*

*Purser, Cheshire, Manning & Parker, by Thomas C. Manning and Barbara A. Smith, for the defendant appellant.*

BRASWELL, Judge.

While reserving his right to appeal pursuant to G.S. 15A-979(b) from an order of Judge Winberry denying his motion to suppress evidence obtained from a search and seizure, defendant pled guilty before Judge Stevens and was sentenced to five years for trafficking in marijuana. At issue is whether the detention of defendant and his airplane was an unreasonable seizure under the Fourth Amendment of the United States Constitution. For the reasons that follow, we hold that the detention was not an unreasonable seizure.

The only motion to suppress, dated 2 April 1982, fails to contain a statement of any grounds to support the motion. The defendant made no affidavit. *See* G.S. 15A-977(a). The court, however, proceeded to hold an evidentiary hearing on the general motion. The order denying relief was filed 14 July 1982.

In denying defendant's motion to suppress, Judge Winberry made 84 findings of fact and concluded that none of defendant's rights under the United States and North Carolina Constitutions had been violated. In reviewing the order, we must determine whether the findings of fact are supported by competent evidence and whether the findings of fact support the court's conclusions of law. *State v. Cooke*, 306 N.C. 132, 134, 291 S.E. 2d 618, 619 (1982); and *State v. Jackson*, 306 N.C. 642, 649, 295 S.E. 2d 383, 387 (1982).

Exceptions to six specific findings of fact appear of record. An exception was made to each of the three conclusions of law, and a tenth exception was made to the order itself. Each exception to a finding of fact has been carefully reviewed against the whole of the evidence and the trial court's findings of fact are held to be fully supported in every instance.

In summary, the competent evidence at trial upon which the trial court's findings of fact are based show the following:

At approximately 3:50 a.m. on 22 February 1982, Deputy Sheriff Robert Mauldin was at his residence in Dare County near the Manteo Airport when he heard an airplane circling the Manteo Airport. Deputy Mauldin dispatched a Manteo police officer, Officer Samuel Pledger, to the airport. Officer Pledger arrived and observed an airplane land and taxi around the runways.

The airplane was on the ground approximately ten minutes before it cut off the motors. To Officer Pledger the pilot of the airplane appeared to be lost.

When the airplane stopped, Officer Pledger and Deputy Mauldin, who had then arrived, approached the airplane on foot. The time was then 4:15 a.m. The pilot, the defendant, told Officer Pledger that he had been having icing problems and that he was going to wait for it to warm up. Defendant produced his pilot's license at Officer Pledger's second request. When asked if he had filed a flight plan, defendant replied that he was flying instrument flight rules. When asked about the plane's registration, defendant first replied that it was registered in his name, then he said it was in his name and his partner's, and finally he said it was registered to a corporation. Defendant was unable to produce an airworthiness certificate or registration for the aircraft upon request. Defendant also refused consent to a search of the airplane at 4:30 a.m.

The defendant also told Deputy Mauldin, who repeated it to Agent Hoggard, that he had landed because of icing problems and had come down to wait for it to warm up. The defendant also said that he was somewhat low on fuel and was going to wait for the airport to open, obtain fuel, and proceed north to Hartford. These statements were later made directly to Agent Hoggard. Subsequent evidence showed that the fuel dock at the airport did not open until approximately 8:00 a.m. In fact, at approximately 8:15 to 8:20 the defendant did refuel the airplane after taxing it to the fuel dock.

The officers moved their vehicles behind the airplane about 4:30 a.m. and kept the airplane under observation until Special Agent W. A. Hoggard, III, of the North Carolina State Bureau of Investigation arrived at 5:40 a.m. In the meantime Agent Hoggard had been informed that the plane was registered as "Sale Reported," with an address in Factoryville, Pennsylvania. "Sale Reported" means that the plane is being sold and the sale is being reported to the FAA until the aircraft was re-registered. Agent Hoggard had also been informed about 5:00 a.m. by the U.S. Customs Sector Office in Washington, D. C., that a Robert Jason Darack with the same date of birth, pilot's license number and same Social Security number was a suspect in aircraft co-

caine smuggling in Tampa, Florida, in October 1981, and that at
that time he was believed to be carrying concealed weapons and
possibly armed and dangerous. Later, the defendant said he was
sometimes called Jason. Agent Hoggard also discovered, through
the Dare County Sheriff's Office, that there was no identifiable
criminal record on Robert John Darack and no stolen report on
the aircraft. Upon Agent Hoggard's arrival, Officer Pledger and
Deputy Mauldin related to him what they had gathered from
defendant.

The airplane had three windows per side, with the two rear
windows on each side being covered with a reflective covering.
The passenger area of the aircraft seemed to be fully loaded with
something up to the pilot's seat.

At 7:02 a.m., defendant started an engine of the aircraft and
turned on some of the aircraft lights, at which point Agent Hog-
gard moved his vehicle in front of the airplane, got out of the
vehicle, showed his badge, and motioned for defendant to cut the
engine. Deputy Mauldin moved his vehicle to the plane's left
wing, got out of the car, and placed a rifle on top of the car. Of-
ficer Pledger's vehicle remained behind the airplane. Defendant
shut the engine off and got out of the plane at Agent Hoggard's
request. Agent Hoggard told defendant that he was not under ar-
rest, that he just wanted to talk to defendant, and that he was
trying to obtain some information about the aircraft's registra-
tion.

While seated in Agent Hoggard's car, defendant told Agent
Hoggard, in response to questioning, that the aircraft was reg-
istered to a corporation but he did not know the name of the
official registered owner. He did not know of any registration in-
formation in the aircraft. Defendant stated that he was not get-
ting ready to leave when he cranked the airplane, but was merely
attempting to warm the aircraft. He had departed from Myrtle
Beach, South Carolina, en route to Hartford, Connecticut, when
he was forced to land at Manteo because of icing conditions. He
was also low on fuel and was waiting for the fuel docks to open in
the morning. He was unable to produce an airworthiness cer-
tificate, a maintenance log, or a pilot's log. He explained that he
was driving the airplane around the airport because he was look-
ing for the aircraft parking area. When Agent Hoggard asked if

he objected to a search of the aircraft for registration information, defendant replied that he did object. At that time, approximately 7:35 a.m., Agent Hoggard told the defendant that he believed the defendant was either piloting a stolen aircraft or involved in smuggling, and that he was going to obtain a search warrant for the aircraft. Agent Hoggard further explained to the defendant that he was not in any way detained, that he could come and go as he pleased, but that he could not take the airplane. If he attempted to take the airplane, the officers would attempt to stop the airplane and conduct an emergency search.

While Agent Hoggard was attempting to obtain a search warrant, defendant was allowed to refuel the airplane. All exits, however, for the plane remained blocked.

At approximately 9:00 a.m., while Agent Hoggard was typing the affidavit for the search warrant, U.S. Customs Agents arrived at the Dare County Courthouse. The Customs Officers, accompanied by Agent Hoggard, went to the airport and questioned defendant regarding customs and his travels. Defendant told the customs agents that he had tied down and refueled in Myrtle Beach, South Carolina. The agents telephoned the Myrtle Beach Airport to verify defendant's statement and discovered that defendant had only refueled at Myrtle Beach, and had not tied down as defendant had indicated. Defendant could not produce any tie-down records or any other verification of his travels. At 9:15 a.m., the Customs Officers informed defendant that they were detaining him because he had not satisfied them that he had not come from outside the United States.

At 10:02 a.m., a dog specially trained in the detection of controlled substances "alerted," signifying the presence of controlled substances in the aircraft. Agent Hoggard had initiated the call for the dog about 6:00 a.m. The handler and his dog were in Norfolk, Virginia. It was about 8:00 a.m. before the handler's dog and government car could be obtained. Traveling from Norfolk the dog and handler arrived at the airport about 10:00 a.m. The dog had proven reliable in the past in twelve other court cases. At 11:35 a.m. a search warrant was issued, and was executed at 11:45 a.m. As a result of the search, approximately 1,000 pounds of marijuana was found on the aircraft.

Between 7:35 a.m., the time Agent Hoggard told defendant the airplane was being detained, and about 11:45 a.m. when the search warrant was served, the defendant left the airplane, went into the base operations office, drank coffee, went to an outside pay telephone booth and made phone calls. His personal movements were not physically restricted until the search warrant was served. However, the Customs Officer did tell him verbally that he was being detained at about 9:15 a.m.

A simplified timetable is now given in order to bring the major events into focus:

4:00 a.m. — Approximate time airplane lands.

4:15 a.m. — Officers first make contact with defendant; defendant to wait until fuel dock opened.

5:00 a.m. — Agent Hoggard gets information Robert Jason Darack was a suspect in a 1981 aircraft cocaine smuggling in Florida and then believed armed and dangerous.

7:02 a.m. — Defendant starts engine.

7:35 a.m. — Agent Hoggard detains airplane and said he would attempt to get a search warrant.

9:00 a.m. — U.S. Customs Officers arrive while Hoggard at courthouse.

9:15 a.m. — Customs Officers detain defendant's person, though not arrested.

10:02 a.m. — Dog alerts to controlled substance on airplane.

11:35 a.m. — Search Warrant issued.

11:45 a.m. — Search Warrant executed and marijuana found.

We now review and balance the competing interests for a limited seizure of the person and a limited seizure of personal property "to determine the reasonableness of the type of seizure involved within the meaning of 'the Fourth Amendment's general proscription against unreasonable searches and seizures.'" *United States v. Place,* --- U.S. ---, ---, 103 S.Ct. 2637, 2642, 77 L.Ed. 2d 110, 118 (1983), *quoting Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed. 2d 889, 905 (1968). In considering Fourth

Amendment constitutional issues we observe that a copious quantity of cases exists. For the law applicable to the present case, we feel that the one citation to *Place* suffices to provide an avenue to locate other citations to the basic search and seizure holdings, and upon which the review for reasonableness emanates.

The *Place* decision answers "yes" to the issue that law enforcement officers can temporarily detain personal property "for exposure to a trained narcotics detection dog on the basis of reasonable suspicion that the [personal property] contains narcotics . . . [and that] the Fourth Amendment does not prohibit such a detention." *United States v. Place, supra*, at - - -, 103 S.Ct. at 2639, 77 L.Ed. 2d at 114-15.

Under the totality of the circumstances in the case before us we apply the principles of *Terry v. Ohio, supra*, as did *Place, supra*, at - - -, 103 S.Ct. at 2641-42, 77 L.Ed. 2d at 117, and hold that these cases permit "warrantless seizures of personal [property] from the custody of the owner on the basis of less than probable cause, for the purpose of pursuing a limited course of investigation . . . [and] permit such seizures on the basis of reasonable, articulable suspicion, premised on objective facts, that the [personal property] contains contraband or evidence of a crime." *Place* formally recognizes an exception to the standard probable cause requirements for a limited seizure of both the person and property, and in context, examines and tests whether the competing law enforcement interests are substantial.

Here, the type of stop and subsequent detention of defendant Darack were "substantially less intrusive of a person's liberty interests than a formal arrest." *Place, supra*, at - - -, 103 S.Ct. at 2643, 77 L.Ed. 2d at 119. In the light most favorable to defendant under both the State and defendant's evidence, the defendant had not intended to leave until he could refuel his airplane. This could not be done until the fuel pumps opened and the attendant arrived at 8:00 a.m. In fact, the defendant did refuel at about 8:00 a.m. Both before and after 9:15 a.m., the first time any officer told defendant he was himself being detained, he was permitted freedom of movement about the airport where he used the outside pay telephone without restraint. We hold that the detention of Darack from 9:15 to 10:02 when the dog alerted to the law enforcement officers the presence of controlled substances by the

sniff test was reasonable. After 10:02 a.m. the total circumstances shifted to the rank of probable cause to detain for the subsequent search of the airplane.

There was no seizure of the airplane at 4:15 a.m. The pilot, the defendant, on his own volition, chose to remain with the plane until the fuel pumps opened at 8:00 a.m. There was a detention of the airplane at 7:02 a.m. when the engines were started, even though the ensuing conversations between officers and the defendant did not result in an announced detention of the plane by Agent Hoggard until 7:35 a.m. The detention from 7:02 a.m. to 10:02 a.m. when the sniff test of the dog indicated the presence of a controlled substance was not unreasonable under the law of *Place* and *Terry*. After 10:02 a.m. there was probable cause to continue to hold the airplane for the subsequent search by search warrant.

At all times the officers were pursuing a legitimate limited course of investigation. Intertwined with their suspicion of the presence of controlled substances was their suspicion that the aircraft had been stolen. The basis of the reasonable articulable suspicion, premised on objective facts that the airplane contained controlled substances or was evidence of a crime, include these facts and circumstances: the landing of the plane in an uncontrolled airport in the predawn hours; the proximity of the airport to the open ocean; the defendant's evasive or uncertain answers regarding the registration of the aircraft; the absence of any severe weather conditions which would have forced defendant to land; the taxiing around the airport for some 10 minutes before shutting off his engines; the pilot's appearance of being lost; the covering on the airplane's rear windows; the appearance of the airplane being loaded with cargo up to the pilot's seat; the pilot's answer that it contained only his personal effects and baggage and nothing else of value; the pilot's path of travel from somewhere in the South Atlantic States by way of a stop at Myrtle Beach, South Carolina, to the northern part of the United States; the defendant's flight pattern was consistent with the usual pattern of aircraft carrying illegal drugs; the information from the U.S. Customs Office that defendant was a suspect in cocaine smuggling in Florida in October 1981 [the date of the events of this present case is 22 February 1982, approximately four months time span] and was then believed armed and dangerous;

the use of the airplane by Darack was not readily traceable as to either actual ownership or name of the individual who put defendant in possession; the pilot only having purchased fuel at Myrtle Beach and not having tied down there as he had said; and the trained opinion of Agent Hoggard that the defendant and airplane fitted a smuggling profile. The dog, "King," subsequently added an additional observable fact by his alerting to the presence of a controlled substance in the snift test at the airplane. The detention, therefore, whether it be of person or property, and regardless of the hour, was not unreasonable.

We conclude that the trial court's findings of fact manifestly support the conclusions of law, and that none of the defendant's constitutional rights were violated. The general motion to suppress, even after an extended evidentiary hearing in which all facets of the events were developed, was properly denied.

Affirmed.

Judges HEDRICK and EAGLES concur.