THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT BOYD, Defendant-Appellant.

First District (4th Division)   No. 1—90—1400

Opinion filed June 13, 1991.

Edward M. Genson, of Genson, Steinback & Gillespie, of Chicago, for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Mary Brigid Kenney, and Michael Brychel, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant Robert Boyd was charged with possession of cannabis with intent to deliver in violation of section 5(e) of the Cannabis Control Act. (Ill. Rev. Stat. 1987, ch. 56½, par. 705(e)). He unsuccessfully moved to suppress evidence seized from his luggage after exposure to a narcotics detector dog. He was then convicted as charged after a stipulated bench trial and sentenced to a prison term of three years. The issue on appeal is whether the police had a reasonable, articulable suspicion that the defendant's luggage contained contraband.[1]

Chicago police detectives George Graham and George Mays learned from a passenger manifest that the defendant would arrive at Union Station in Chicago on April 4, 1989, on Amtrak train No. 4, which originated in Los Angeles, California. They learned further that the defendant had paid $446.50 cash for a one-way ticket from Flagstaff, Arizona, to New York City, via Chicago, and that he had occupied a sleeper compartment on car 431 of the train. They knew that the length of the trip from Flagstaff to Chicago was two days. They were aware that Flagstaff was a source city for marijuana for

---

[1] In his brief, the defendant has explicitly based his argument solely upon the testimony of the police detectives. Given these circumstances, we will limit our discussion to their version of the incident.

Chicago and the east coast. They were aware that drug couriers frequently used sleeper cars to conceal contraband from the other passengers and paid cash for their tickets to avoid being traced. However, they were also aware that ordinary passengers also used sleeper cars and could pay for their tickets with cash.

The detectives initiated their surveillance about 3:30 p.m. on April 4, 1989, and they asked the conductor to notify them when the defendant was about to leave the train. They then watched the other passengers leave car 431 of the train, but the defendant was not among them. Graham therefore boarded the train and asked an attendant whether the defendant had exited. The defendant then walked past Graham and exited the train several minutes after the other passengers had left. The attendant nodded toward him, and the detectives followed him.

The defendant had two suitcases. He walked down a ramp toward the main station. After he had walked about 75 feet, he looked over his shoulder and made eye contact with the detectives. Pulling the suitcases, he then quickened his pace and entered the terminal. He walked a short distance and again looked over his shoulder and made eye contact with the detectives. He appeared to be nervous.

He entered a washroom, where he remained several minutes. The two detectives waited outside the washroom, directly across the concourse. When the defendant emerged from the washroom, he looked directly at the detectives. He then quickly turned to his right and quickly walked about 25 feet toward the north track. The two detectives then both approached him on the left and displayed their identification. The encounter occurred about 3:40 p.m. on the main concourse when many people were present.

Graham asked whether he could speak with the defendant, and the defendant responded, "[S]ure." The defendant then stopped, and he and Graham turned toward each other. When Graham asked the defendant his name, the defendant answered truthfully. Graham then asked the defendant where he had come from, and the defendant answered that he had come from Los Angeles, California.

Graham next asked the defendant for identification, and the defendant produced a New York driver's license which contained his name and photograph. Graham glanced at it, returned it to him and asked to see his train ticket. The defendant became nervous, hesitated, stammered, felt around his body and stated that he did not have it and that he thought he had lost it.

Graham asked the defendant whether the suitcases were his, and he replied that they were. Graham also asked the defendant whether he had packed them himself and whether he had maintained control over them since that time. The defendant answered in the affirmative. The defendant became more nervous and asked Graham, "[W]hy are you talking to me?" Graham explained that they were conducting a narcotics investigation and he asked the defendant whether his luggage contained narcotics. The defendant responded that it did not. Graham then informed the defendant that he was not under arrest and that he was free to leave. Graham also asked whether he could search the defendant's luggage, and he explained that he could not search it without the defendant's permission unless he had a search warrant, which he did not have. The defendant stated, "[N]o, you can't search the bag." Graham then informed the defendant that he would detain the luggage for about 10 minutes for inspection by a dog trained to detect drugs. Graham stated that the defendant could remain with the luggage or could leave, in which case Graham would give him a receipt for the luggage and return it to him later. The defendant remained, and Graham repeated the choices again.

The entire preceding conversation occurred in the middle of the concourse. People passed by on both sides. Graham stood 12 to 18 inches from the defendant, and Mays stood slightly to Graham's rear and left. They never touched the defendant, nor did they display their weapons or raise their voices, but they were both large men. During the conversation, the defendant stated that he was a self-employed landscaper.

They then proceeded upstairs one level to an Amtrak office. Graham took one suitcase and Mays took the other one. The defendant followed behind them. They did not force him to follow. When they reached the office, Graham went to his car to get his dog, Mays concealed the luggage in the office, and the defendant stood in the hall outside the office.

When Graham returned with the dog, he commanded the dog to "fetch dope." The dog sniffed around the office and began to bite, scratch and paw the larger suitcase. The dog's reaction was a positive alert for marijuana or narcotics. Graham then told the defendant, who was still outside the office, that the dog had reacted positively and that the suitcase would be detained pending procurement of a search warrant. Graham repeated that the defendant was free to leave and asked the defendant for identification so that he could prepare a receipt for the defendant. The defendant, however,

refused to produce any identification or to answer questions about his age, residence, address or telephone number.

After obtaining a search warrant for the larger suitcase, the detectives discovered marijuana in it and arrested the defendant. They then opened the second suitcase and found marijuana in it, too. (The parties stipulated at trial that a police chemist would testify that the marijuana weighed 13,915.08 grams, which we believe is approximately 37 pounds.) The detectives also recovered the defendant's travel agency voucher, but not his Amtrak train ticket, from his luggage.

At the conclusion of the suppression hearing, the trial court ruled that the detectives were credible, and it denied the motion to suppress. On appeal, the defendant contends that the detectives seized his luggage without the requisite reasonable belief or suspicion, based upon specific and articulable facts, that the luggage contained contraband. The State contends that the detectives reasonably suspected that the defendant's luggage contained contraband and justifiably subjected it to a canine sniff test.

■■ Although the initial encounter between the defendant and the detectives was consensual (see, *e.g., People v. Gentile* (1990), 205 Ill. App. 3d 952, 958, 563 N.E.2d 926; *People v. Ward* (1990), 205 Ill. App. 3d 439, 441, 562 N.E.2d 1167; *People v. Price* (1990), 195 Ill. App. 3d 701, 707-08, 552 N.E.2d 1200; *People v. Jones* (1989), 190 Ill. App. 3d 416, 421-23, 545 N.E.2d 1332), the defendant explicitly refused to consent to any search of his luggage. Therefore, we must determine whether the detectives' investigatory detention of the defendant's luggage for the purpose of a canine sniff test was based upon a reasonable, articulable suspicion that the luggage contained contraband. (See *United States v. Place* (1983), 462 U.S. 696, 702, 77 L. Ed. 2d 110, 117-18, 103 S. Ct. 2637, 2642.) A court must examine the totality of the circumstances to determine whether a brief, investigatory detention of luggage was justified by a reasonable, articulable suspicion that it contained contraband. (See *People v. Statham* (1991), 209 Ill. App. 3d 352, 360-61.) A court of review will not reverse a trial court's ruling on a motion to suppress evidence unless it was manifestly erroneous. *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766.

■■ Turning to the case at bar, we believe that *People v. Nelson* (1989), 188 Ill. App. 3d 619, 544 N.E.2d 1111, is controlling. In *Nelson*, the police knew that the defendant had used his own name and had paid cash for a one-way Amtrak ticket from Florida, a source State for drugs; that he had occupied a roomette (a sleeping com-

partment); and that he had cancelled or changed his reservations several times without providing a call-back number. The defendant also scanned the area when he left the train, appeared to be nervous when the police questioned him, and allegedly lied about his point of origin. We held that the police lacked the requisite reasonable, articulable suspicion that the defendant's luggage contained contraband. Similarly, in this case, the detectives knew that the defendant had purchased a one-way cash ticket but had used his own name, that he had boarded the train in Flagstaff, a source city for marijuana, that the length of the trip from Flagstaff to Chicago was two days, and that he had occupied a sleeping compartment. Moreover, he appeared to be nervous when they questioned him. In our view, these circumstances are virtually identical to the circumstances in *Nelson*, and we therefore reach the same conclusion that the detectives lacked the required reasonable, articulable suspicion that the defendant's luggage contained contraband.

The State contends, however, that certain additional circumstances here rendered *Nelson* factually distinguishable and established the requisite reasonable, articulable suspicion in this case. We disagree. For example, the State asserts that the defendant lied about his point of origin because he boarded the train in Flagstaff but told the detectives that he had come from Los Angeles. Contrary to the State's assertion, these facts are not necessarily inconsistent and do not necessarily show that the defendant lied about his point of origin.

The State similarly contends that the defendant dishonestly tried to conceal his destination by claiming that he had lost his train ticket when he was actually scheduled to proceed to New York. The detectives, however, admitted that they failed to find the defendant's train ticket even after having searched him and his suitcases.

We also reject the State's other efforts to distinguish this case from *Nelson*. The State suggests that the defendant stayed on his car of the train several minutes longer than the other passengers in order "to avoid surveillance." However, the State's suggestion is pure speculation; very little imagination is required to realize that there are many other equally plausible but perfectly innocent explanations for the defendant's slightly tardy departure from the train.

Finally, the defendant's nervousness, his quickened pace, his glances toward the detectives, who were following him, and his use of the washroom, also can all be innocently explained. He was in an unfamiliar environment and was being followed by two large men.

900

We conclude that the totality of the facts and circumstances did not provide the detectives with a reasonable suspicion that the defendant's luggage contained contraband. Therefore, the motion to suppress should be allowed.

For the foregoing reasons, the judgment of the circuit court is reversed and the matter is remanded for a new trial.

Reversed and remanded.

JOHNSON and LINN, JJ., concur.