THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
KARLA BREEDING, Defendant-Appellant.

First District (6th Division)   No. 1—89—2120

Opinion filed September 20, 1991.

Genson, Steinback & Gillespie, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Joseph Brent, and Stephen Ferrucci, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Karla Breeding, and Fred Lenover were tried in a bench trial for possession of a controlled substance with intent to deliver and armed violence. The defendant was found guilty of both charges and sentenced to six years' imprisonment. Lenover was found not guilty.

The defendant contends that the judge erred in denying her motion to quash arrest and suppress evidence and that the evidence failed to prove her guilt beyond a reasonable doubt. In passing on the denial of the motion to suppress, we will consider the evidence heard on the motion itself and the evidence at the trial. *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.

On October 6, 1987, the defendant boarded an Amtrak train en route from Los Angeles to Chicago. The train arrived at Union Station in Chicago at approximately 5:40 p.m. on October 8, 1987. When the train arrived, Drug Enforcement Agent Norbert Kuksta, Chicago police department detective Michael Bobko, and Chicago police officer Mel Schabilion were at the station. Bobko and Kuksta were dressed in casual civilian clothes.

Bobko testified that he positioned himself where he could observe the passengers leaving the train coming from Los Angeles. He paid close attention to this particular train because Los Angeles is a documented "source city" for the origination of narcotics smuggling; however, the officers did not have any information about any narcotics being on the train. Bobko said he observed hundreds of people exiting the train, several with tote bags. Some of the passengers walked fast, while others walked slowly. Some of the passengers looked around as if watching for people to pick them up, or looking for family members.

After most of the passengers had deboarded, Bobko observed the defendant walking slowly down the train way toward the main waiting room. She was carrying a nylon tote bag over her shoulder and a purse in her hand. He did not see whether she had deboarded from the very last car of the train. When the defendant entered the station from the track area, she looked around, and then she looked in the direction of Fred Lenover, who was standing with his back against the outside wall of a restaurant located in the lower lobby of the station.

When the defendant saw Lenover, she walked slowly toward him. When she was four or five feet from Lenover, he nodded his head sharply to the right. She continued walking past Lenover. Lenover

hesitated briefly, looked around, and then joined her walking through the lower lobby of the station. As they were walking, Lenover took the tote bag from her shoulder and placed it on his own shoulder. Bobko and Kuksta followed a few steps behind them. Bobko testified that he heard her deeply sigh and tell Lenover, "These have been the longest two days of my life."

Bobko testified that Lenover then looked back at him, nudged the defendant with his arm, and put his index finger to his lips. On cross-examination, Bobko admitted that he had not included those actions in any of his reports or in the verified application for a search warrant he later made. Kuksta never mentioned this "hushing" gesture in his testimony. Bobko testified that the defendant looked back and made eye contact with him, became rigid and pale, and then looked at both Lenover and Bobko several times.

Lenover and the defendant walked toward the baggage area and main waiting area. Bobko testified that as they were walking, Lenover and the defendant both looked back every several steps. They stopped and stood against a wall on the ramp leading to the waiting room; Lenover gave the tote bag back to the defendant and walked in the direction of the men's restroom. Lenover and the defendant appeared "nervous" and the defendant had "paled." Bobko admitted that the defendant's complexion normally is "very pale." After Lenover walked away, she took a cigarette out of a pack; she had difficulty getting the cigarette out of the pack, and she made four attempts before successfully lighting the cigarette.

Bobko and Kuksta approached the defendant. Bobko displayed his police badge and credentials and asked her if she would mind speaking to him. She replied, "Of course I'll speak with you." She had her back to the wall, and Kuksta stood beside her about two feet away while Bobko stood directly in front of her, also about two feet away. There was an exit approximately 40 feet away.

The officers asked her if they could see her train ticket, and she replied that she had lost it. When Kuksta and Bobko asked whether she had come from California by train, she replied that she had. They asked specifically where she had boarded the train, and she told them "Comstock or something like that." When they asked her name, she replied "Karla." Bobko testified that when they asked her last name the defendant hesitated and replied "Brown." Bobko read the luggage tag on the tote bag which said "Karla Breeding" and contained an Indiana address. On cross-examination, Bobko said she explained that Brown was her married name and Breeding was her maiden name. In his verified application for a search warrant he stated that she said

"Brown" was her maiden name. Kuksta testified at trial that she said Brown was her married name but she was no longer married. The officers asked her for identification, and she produced an Indiana driver's license in the name of Karla Breeding. The officers examined the license and then returned it. Bobko told her that they were conducting a narcotics investigation and asked if she had drugs in her luggage. She replied "No." Bobko asked her if she would let them search her purse and tote bag for drugs, noting that she was able to refuse and that he could not search them without her consent. He said he told her that it was a "consensual encounter." She told the officers that they could search her purse, but not the tote bag.

Bobko searched her purse and found no contraband. She then asked if she was free to leave and Bobko responded that she was free to leave, she was not under arrest. She asked if she could take her tote bag with her, and Bobko told her that her tote bag would have to be detained for a dog to do an external examination of the bag to determine if there was a narcotic odor. He explained that if the dog reacted positively, the bag would be further detained and they would attempt to get a search warrant to search the bag for narcotics. Otherwise, the bag would be returned to her. She was offered a receipt for the bag; she declined to take it and left.

Bobko took possession of the tote bag and summoned Officer Schabilion and his narcotic certified dog for the "dog check." Schabilion instructed the dog to "fetch dope." The dog reacted "positively" to the defendant's tote bag, indicating the presence of narcotics. Bobko testified that less than 10 minutes elapsed between the time that he took possession of the defendant's bag and the time that the dog check took place. The officers then took the bag to Narcotic Headquarters at 1121 South State Street and obtained a search warrant for the bag.

When the officers opened the bag, they found a package containing an off-white crystalline powder, which was later determined to be 536.25 grams of methamphetamine. The officers also found a small quantity of marijuana and a derringer revolver containing five live rounds of ammunition.

Judge Robert Collins denied the defendant's motion to suppress the evidence; he found that there was sufficient probable cause to justify the seizure of evidence under *People v. Forrest* (1988), 172 Ill. App. 3d 385, 526 N.E.2d 616, which he had just read after its citation by the State. Following a bench trial, Judge Loretta Morgan found the defendant guilty of armed violence and possession of a controlled substance with intent to deliver. On August 3, 1989, Judge Morgan

sentenced the defendant to the minimum of six years' imprisonment in the Illinois Department of Corrections.

The denial of the suppression order involves two separate issues: Did the actions of the officers in approaching and questioning the defendant constitute a "seizure" or was it a "consensual encounter"? Was the retention of the defendant's tote bag an unreasonable seizure under the circumstances? *People v. Forrest* (1988), 172 Ill. App. 3d 385, 526 N.E.2d 616.

■ The defendant argues that the original stop by the police constituted an unreasonable seizure of her person; the State disagrees. The State alternatively argues that if her person was seized, the seizure was justified. Because we have determined that the order denying suppression must be reversed on the second ground, that is, that the retention of the defendant's tote bag was an unreasonable seizure under the circumstances, it is unnecessary to discuss and analyze at length the evidence concerning the original stop. We do, however, agree with the State that the original stop and questioning by the police was a consensual encounter and not a seizure of the defendant's person. (See *People v. Statham* (1991), 209 Ill. App. 3d 352, 568 N.E.2d 183; *People v. Jones* (1989), 190 Ill. App. 3d 416, 545 N.E.2d 1332.) We do not agree with the State's alternative argument that the officers were justified in seizing the defendant when they first approached her.

The cases cited by the defendant are distinguishable. In *Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319, the police prevented the defendant from leaving by not returning his ticket or identification, and the police took the defendant to a small room to question him. In *United States v. Sokolow* (1989), 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581, the officer grabbed the defendant's arm and pulled him back onto the sidewalk and then questioned him. In *People v. Kiser* (1983), 113 Ill. App. 3d 501, 447 N.E.2d 858, one officer grabbed the defendant and asked to speak to him, while the two other officers blocked the exit doors. The officers then took the defendant to another area where they repeatedly examined the defendant's rental car agreement and identification while they awaited computer information from which to determine whether he was engaged in criminal activity. In each of those cases, the reviewing court held that the conduct of the police would lead a reasonable person to believe that he was not free to leave. In this case, a fact finder could conclude that the defendant acting as a reasonable person would believe that she was free to go.

■ We turn now to the question of the detention of the defendant's tote bag. In *United States v. Place* (1983), 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637, the Court held that the detention of luggage for purposes of investigation must be justified by a reasonable suspicion based on specific articulable facts that the luggage contains narcotics. The facts used to support such an investigatory detention are insufficient when they describe "a very large category of presumably innocent travelers, who would be subject to virtually random seizures." (*Reid v. Georgia* (1980), 448 U.S. 438, 441, 65 L. Ed. 2d 890, 894, 100 S. Ct. 2752, 2754.) In determining whether a reasonable suspicion exists, the court must consider the totality of the circumstances. (*United States v. Sokolow* (1989), 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581.) A trial court's ruling on a motion to suppress evidence will not be reversed unless manifestly erroneous. *People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.

Judge Collins, it should be noted, found that the evidence established "probable cause" for the detention of the defendant's tote bag. The State concedes that whether "probable cause" exists is not the issue. Since probable cause requires a higher degree of proof than a reasonable suspicion, Judge Collins' conclusion is not fatal to the State's position. If a fact finder concludes that the evidence establishes probable cause for seizure of property, *a fortiori*, he has concluded that the specific articulable facts justified a reasonable suspicion that the property contains contraband.

We have disagreed with the State's alternative argument that the officers would have justifiably seized the defendant when they first approached her. Our position leads to the next conclusion that the officers would not have been justified in detaining her luggage at that point. The question becomes, therefore, whether facts arose after the initial stop which, taken with the facts which preceded the stop, justified the seizure of the luggage. We agree with Judge Collins' conclusion that what occurred after the luggage was seized is not relevant.

The facts upon which the State relies are as follows. The defendant was on a train that had originated in a city which is a known "source" for narcotics. The defendant was among the last persons to exit the train, and she walked slowly and looked around at the crowd. She made eye contact with Lenover and walked slowly toward him. Lenover nodded his head sharply to the right, and he joined the defendant, walking after she had passed him. Lenover took the tote bag from her shoulder and placed it on his own shoulder. The defendant sighed deeply and remarked, "These have been the longest two days of my life." Lenover turned and looked at the officers, nudged

the defendant and placed his index finger against his lips. The defendant turned pale; she looked back and made eye contact with one of the officers. As the defendant and Lenover continued walking, they looked back at the officers every few steps. The defendant and Lenover stopped by a wall; Lenover transferred the tote bag back to the defendant and left the area to go to a washroom. The defendant had difficulty removing a cigarette from the pack and attempted to light it four times before succeeding. She told the officers that she had lost her train ticket. When asked her name, she said, "Brown," and her luggage and driver's license identified her as "Breeding."

A number of cases have arisen in this State involving the use of the "drug courier profile" by police officers in detaining persons and luggage at airports and railway terminals. We shall confine our discussion to those cases which involve the behavior of the defendant before and after being approached by the officers.

In its brief, the State does not refer to any specific case as factually similar to this case. In the trial court the State cited, and Judge Collins followed, *People v. Forrest* (1988), 172 Ill. App. 3d 385, 526 N.E.2d 616. In *Forrest*, the trial judge had suppressed the evidence, holding that the State was required to establish probable cause; the appellate court reversed. In addition to the defendant's suspicious behavior before the police confronted him, he was argumentative and said that he was "irritated at frequently being asked to allow a search of his bags for drugs." (172 Ill. App. 3d at 388.) The fact that the officers were made aware that the defendant had frequently been asked to allow a search of his bags for drugs is highly probative. The appellate court expressed its reason for reversal as follows:

> "Because the trial court relied upon law which has been superseded, it failed to properly apply the law as currently set forth by the United States Supreme Court and Illinois courts. Furthermore, because the trial court failed to distinguish the seizure of defendant's person from the seizure of defendant's bag, in addition to its improper application of law, we find that the decision of the trial court was manifestly erroneous." (172 Ill. App. 3d at 393.)

It appears to us that the impact of the appellate court's determination that the detention of the luggage was proper is softened by the fact that the court's focus was on the trial judge's erroneous interpretation of the law.

In *People v. Steckhan* (1983), 116 Ill. App. 3d 173, 452 N.E.2d 122, the defendant was the last person to deboard a flight from a source city, he walked slowly and he looked over his shoulder several

times. The officers testified that the defendant's ticket had been purchased that same day with cash. The defendant was visibly shaking while the officers questioned him. The appellate court held that detention of the defendant's luggage was not justified because he was the last passenger to deboard the plane, was young, walked slowly through the concourse, looked over his shoulder and his flight originated in a source city. The court pointed out also that nervousness is a characteristic of many innocent travelers.

In *People v. Sherman* (1989), 190 Ill. App. 3d 814, 547 N.E.2d 476, the defendant was traveling under an assumed name, and he paid cash for two one-way tickets from Ft. Lauderdale, Florida to Michigan. The officers learned that the defendant gave the reservation agent a call-back number to a hotel, but there was no guest there whose name matched the name on the defendant's reservation. When the train arrived at the station, two men, including the defendant, exited the train together; however, one man stopped for a moment and then followed about 10 feet behind the other man. When questioned by the officers the defendant seemed "a little bit afraid." (190 Ill. App. 3d at 816.) The appellate court affirmed the suppression of the evidence recovered from the defendant's luggage.

In *People v. Nelson* (1989), 188 Ill. App. 3d 619, 544 N.E.2d 1111, the defendant had paid cash for a one-way ticket from Delray Beach, Florida, to Portland, Oregon, and he had cancelled his reservation a couple of times. The defendant was required to change trains in Washington, D.C., and again in Chicago. When he left the train in Chicago, he looked around, as though "scanning the crowd for surveillance." (188 Ill. App. 3d at 620.) When the officers approached the defendant, he gave them his license and ticket, both of which were in his own name. The officers asked him where he boarded the train, and he replied that he had boarded in Washington, D.C. However, when the officers asked him why his ticket said that he had boarded in Florida, the defendant became nervous, began stuttering, and changed his weight from one foot to the other. In response to further questions, the defendant stated that he had once been arrested for possession of marijuana but that he was not carrying narcotics. The trial court granted the defendant's motion to suppress, and the appellate court affirmed, holding that all of the factors, even when considered together, were insufficient to establish a reasonable suspicion that the defendant's luggage contained narcotics.

In *People v. Boyd* (1991), 215 Ill. App. 3d 894, the defendant paid cash for a one-way ticket to Chicago from Flagstaff, Arizona, which the police testified was a "source city." The defendant left the train

several minutes after all the other passengers. After he had walked about 75 feet, he looked over his shoulder and made eye contact with the officers who were following him. He quickened his pace and once again looked over his shoulder and made eye contact with the officers. He appeared nervous. He went into a washroom, and the officers waited outside the washroom. When the defendant came back out, he looked directly at the officers, and then quickly turned and walked away. The officers approached the defendant and questioned him; he answered their questions truthfully. When the officers asked to see the defendant's train ticket, he became nervous, hesitated, stammered, felt around his body and stated that he did not have it, that he thought he had lost it. The appellate court, relying on *Nelson*, reversed the denial of the motion to suppress and concluded that the officers lacked the the required reasonable suspicion that the defendant's luggage contained contraband. The appellate court specifically found that the absence of the train ticket was of no particular significance nor was the fact that the defendant stayed on the car several minutes longer than the other passengers nor was his nervousness, his quickened pace, his glances toward the detectives and his use of the washroom.

For comparison purposes we refer to two cases which upheld the seizure of luggage. In *People v. Statham* (1991), 209 Ill. App. 3d 352, 568 N.E.2d 183, the defendant had alighted from an airplane and caught the attention of Drug Enforcement Agents who were sitting in the airport concourse. The agents followed the defendant to the baggage claim area, and the defendant twice turned around and looked in their direction. The defendant met a man at the end of the concourse, shook his hand, and conversed with him for 5 or 10 seconds. Both men rode the escalator down, and as they stepped off the escalator, the other man motioned toward the baggage claim area. He left, and the defendant walked to the baggage claim area where he picked up a new Samsonite brand suitcase. The suspicion of one of the agents was aroused by the suitcase. He had arrested many people who carried new Samsonite suitcases that contained drugs.

The agents approached the defendant and asked for identification. He produced a plastic card in the name of John C. Statham. When asked if he had a driver's license, he said he left it at home. When asked if he had an airline ticket, the defendant said he had left it on the "airport." He said that he had flown in from Phoenix, Arizona. The agent looked at the identification on the defendant's suitcase and noted that it stated Jeff Driscoll with an address in Phoenix. The agent asked the defendant why the name on the sticker was different,

and after a moment of hesitation, the defendant said he had the wrong suitcase. The agent suggested that they go back to the baggage area and try to find the defendant's baggage. The agent observed an airline ticket in the inside pocket of defendant's carry-on bag. The name on the ticket was Jesse Driscoll. The agent saw that the ticket was for one-way travel from Phoenix to Denver to Chicago and was purchased with $155 cash. The agents told the defendant he was free to leave but that if he wanted to leave they would have to decide whether to detain his suitcase. One agent left to see if he could speak with the man who had met the defendant. He had a suspicion that the bag contained narcotics *because of the untruthfulness of the defendant's answers* and because the defendant had arrived from the southwest.

At the request of an agent, the defendant removed from his wallet an Illinois driver's license with an Illinois address, a social security card and a Western Telephone Company credit card. (He had previously said he had left his driver's license at home.) The defendant then said that someone in Phoenix had given him the suitcase to bring to Chicago. He told one agent that he often used other names when traveling. He also denied talking to anyone on the escalator. In affirming the denial of the motion to suppress the appellate court said this:

> "Although there could have been innocent reasons for the type of conduct exhibited by defendant, including the possession of a certain type of suitcase, the circumstances as a whole provided the officers with a reasonable suspicion that defendant was transporting contraband so that the detention of the suitcase for a canine sniffing test was justified. *Among the factors that were the most significant in providing a reasonable suspicion were defendant's denial that he spoke to another man, defendant's conflicting stories about his ownership of the suitcase, his statement that someone gave him the suitcase to bring to Chicago, and the initial lie that defendant had picked up the wrong suitcase.*" (Emphasis added.) (209 Ill. App. 3d at 365-66.)

In *People v. Furlong* (1991), 217 Ill. App. 3d 1047, the defendant arrived on a flight from West Palm Beach, Florida, identified as a "source city." The defendant's bag appeared lightly packed. The officers overheard the defendant ask the ticket agent where the baggage area was. The defendant then walked past the baggage area, up an escalator back to the ticket area; he stopped in a gift shop; then made a phone call at a pay phone; and again walked past the ticket counter. The defendant was continuously glancing over his shoulder. The appel-

late court held that the officers did not have a reasonable suspicion that the defendant was carrying narcotics when they first approached him. However, reasonable suspicion developed when the officers questioned the defendant and discovered that his ticket had been purchased that same day for cash, his return flight was scheduled only 28 hours after his arrival, and when the defendant gave a suspicious explanation for his short stay. He said that he was in town for a baseball game; however, when the officers asked him what team was playing, he was unable to answer.

■ In the case before us, the two "facts" which occurred after the initial stop are the failure of the defendant to produce her ticket and her answer that her name was "Brown." As noted in *People v. Boyd*, the absence of the train ticket is of no particular significance, particularly since the defendant was at the end of her trip. Moreover, there is no claim that the defendant ever made any untruthful answers to the officers. We must assume that she answered truthfully when she said that "Brown" was her married name. We conclude that factually this case most nearly approaches *People v. Boyd* and that the officers did not have a reasonable suspicion that the defendant's tote bag contained narcotics.

The officers in this case testified that they were suspicious of the defendant because she looked around at the crowd when she got off the train. The trial court correctly acknowledged that this behavior is "not unusual"; Bobko testified that many of the other passengers looked around as if looking for friends or relatives they planned to meet there.

The State also argues that it was suspicious that Lenover took the tote bag from the defendant and carried it on his own shoulder. As the defendant correctly notes, this gesture of common courtesy is hardly suspicious behavior. Moreover, the defendant's statement to Lenover, "These have been the longest two days of my life," is not suspicious, in light of the fact that the defendant had been traveling across the country on an Amtrak train for two days. The officers also testified that the defendant and Lenover appeared nervous and looked behind them often. Nervousness, however, is not uncommon when one is being followed by two men. See *People v. Boyd* (1991), 215 Ill. App. 3d 894, 899.

The State places particular emphasis on the testimony that Lenover nudged the defendant with his arm and placed his index finger against his lips. Apart from the fact that these acts were not done by the defendant and are susceptible of an innocent interpretation, we note that Bobko did not mention these acts in his reports or

in his lengthy and detailed application for a search warrant. Moreover, Agent Kuksta did not testify to these acts. *Cf. People v. Creagh* (1991), 214 Ill. App. 3d 744, 574 N.E.2d 96.

Last, we note that the probability that any given passenger from a "source" city is a drug courier is infinitesimally small. *People v. De-Lisle* (1982), 104 Ill. App. 3d 297, 432 N.E.2d 954.

We share the concern over the dangers and evil of drug traffic expressed by the Supreme Court of the United States and our own supreme court. But we cannot give approval to a seizure which depends entirely on testimony reflecting the subjective interpretation of a person's mannerisms by police officers and other innocent actions on the part of the person detained. Moreover, that testimony based on such subjective interpretation is beyond contradiction by the defendant. Eye contact, paling, appearing nervous, trembling hands, if they do occur, may be proper considerations but more is required. We have found no case which upholds a seizure of luggage solely on the basis of the mannerisms of the defendant which are accompanied by truthful answers or other innocent behavior. We note that in the seminal case of *United States v. Place* the Supreme Court held that the agents had properly seized the luggage but detained it for an unreasonable period of time. Among the facts considered in support of the seizure were tags on the luggage which contained nonexistent addresses *and false information the defendant gave the agents.*

For these reasons, we hold, as did the appellate court in *People v. Boyd,* that the trial judge erred in denying the motion to suppress.

In view of the position we take on the motion to suppress, it is unnecessary to discuss at length defendant's argument that she was not proved guilty beyond a reasonable doubt. It is enough to say her argument must be rejected; if the evidence had been properly seized, the defendant's guilt would have been established beyond a reasonable doubt.

Judgment reversed.

McNAMARA and LaPORTA, JJ., concur.