THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JUDITH R. GUENTHER *et al.*, Defendants-Appellees.

Second District   Nos. 2—91—0425, 2—91—0426 cons.

Opinion filed February 14, 1992.

Roger T. Russell, State's Attorney, of Belvidere (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Dennis P. O'Sullivan, of O'Sullivan, Freek & O'Sullivan, of Belvidere, for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

The State appeals, pursuant to Supreme Court Rule 604(a)(1) (134 Ill. 2d R. 604(a)(1)), from two orders of the circuit court of Boone County, which granted the motions of defendants, Judith Guenther and Karl Guenther, to suppress evidence found in their apartment. The appeals were consolidated on the State's motion. The sole issue in these appeals is whether the trial court erred in finding that defendant Karl Guenther did not consent voluntarily to the search of defendants' apartment.

Karl and Judith were charged with the offenses of the unlawful production of Cannabis sativa plants (Ill. Rev. Stat. 1989, ch. 56½, par. 708) and the unlawful possession of between 30 and 500 grams of cannabis (marijuana) (Ill. Rev. Stat. 1989, ch. 56½, par. 704(d)). Defendants each filed a motion to suppress the evidence seized by police officers on December 7, 1990, from defendants' apartment.

At the hearing, defendants presented the following evidence. At about 6 a.m. on December 7, defendants were awakened by a loud pounding on the door to their apartment. Karl put on a pair of jeans and went to the top of the stairs leading to the exterior door.

Karl yelled down to ask who was at the door. A person responded, "It's Arnie." Karl assumed it was his landlord, Arnie Pearse. Karl came down the stairs and opened the door. Several uniformed police officers were outside, and one of them informed Karl that they had a warrant for his arrest. Pearse was also there, and he was wearing his auxiliary police uniform. Karl informed the officers that he had to get dressed. Karl started up the stairs, and the officers followed him.

Judith was standing at the top of the stairs, and when the officers entered the apartment, she went into the bathroom to get dressed. Karl walked through the kitchen to the living room. He and Judith had slept in that room because they had not yet set up their bed in the bedroom, since they had just moved into the apartment a week earlier. While Karl was putting on a shirt, one of the police officers noticed a pipe on the coffee table. The officer picked it up, smelled it, and then he asked Karl "where's the pot?" When Karl did not respond, the officer then said, "we have the dog in the area and we're going to search the place anyway, so *** you should tell us where the pot is at." Karl then pointed to the closet. Karl admitted on cross-examination that he had smoked marijuana in the pipe the night before. Karl also admitted that he opened the closet door and pointed to the 27 plants.

When Judith emerged from the bathroom, the officers already had taken Karl to the police station. The officers then brought in a drug-sniffing dog to search the apartment. Judith asked if she was going to be arrested. The officers indicated that they were not going to arrest Judith at that time, so she went to work. Judith was arrested when she returned to the apartment.

The State's witnesses related a slightly different version of the events of December 7, 1990. Four officers were assigned to serve an arrest warrant on Karl for the unlawful delivery of marijuana. The officers were Sergeant Glenn Koski of the State Police, special agent Ron Bartlett of the State Police Division of Criminal Investigations, and two Belvidere police officers, John Coduto and Bill Settle. The officers pulled up to the building where defendants occupied the second floor, and the landlord, Pearse, occupied the first-floor apartment.

The officers went to the side door of the building next to the driveway. Officer Settle knocked on Pearse's door and asked him if defendants lived upstairs. Settle also asked Pearse if there was another door to the apartment. Pearse, who was dressed only in jeans, informed Settle that there was a front door to the second-

floor apartment. Settle went to secure that door. Pearse let Settle into the vestibule area, then returned to his apartment to put on shoes and a shirt.

Coduto had the arrest warrant, and he knocked on the side door. When Karl asked who was there, Coduto responded it was "the landlord." When Karl answered the door, Coduto informed him he was under arrest for the unlawful delivery of marijuana. Karl stated that he had to get dressed, and, in the interest of the officers' safety, they followed Karl into the apartment. Coduto informed Settle that they had secured Karl, so Settle came upstairs through the side door. Settle stayed in the kitchen and did not see anything.

Officer Coduto noticed the pipe on the coffee table, and he explained to Karl "that if he had any other drugs in the house that he should give them to [the officers] because [Coduto] had probable cause to bring in a canine unit which was available." Karl told the officers to follow him and opened the closet. Coduto then radioed for the canine unit. When Pearse came upstairs, Karl had already shown the plants to the officers.

There was a conflict in the testimony about whether, prior to the time Karl opened the closet, Officer Coduto mentioned to Karl that the police could get a search warrant for the apartment. Karl admitted on cross-examination that there was mention of a search warrant, and Officer Koski testified that Coduto mentioned a search warrant. Neither Coduto nor Bartlett testified that Coduto said anything about a search warrant.

In ruling on the motion, the court stated that the subterfuge employed by the police to get Karl to open the door was acceptable since the officers immediately identified themselves and showed Karl the warrant. The court also determined that it was reasonable for the officers to follow Karl into the apartment when he went to put on more clothing. The court denied the motion in regard to the pipe because it was in plain view. The court determined that Officer Coduto did not tell Karl that the police could get a search warrant. The court deemed this difference significant:

> "I was rather distressed with Officer Coduto's attitude, which seemed to be very confident that all he needed was probable cause to search and go get a drug dog, and I don't think Officer Coduto based on the way he testified to this day really thinks he would have needed a warrant to go *** get the dog and go through.

> He probably felt he had probable cause just to get the dog. * * *
>
> It is a close case as to what was or wasn't said, and it makes all the difference in the world whether they gave the defendant an option waiting for a warrant or whether they just told him we're going ahead and search and in effect might as well make it easy on everybody by bringing out the drugs."

The court found that Karl did not consent voluntarily to the search. Consequently, the court suppressed the evidence of the plants as against both defendants. The State timely filed this appeal.

We note, at the outset, that defendants have not filed an appellee's brief. We will therefore consider the issue raised by the State pursuant to the standards of *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128.

■ The State contends that the trial court erred in finding that Karl did not consent voluntarily to the search of the apartment. We may not reverse the trial court's determination in this regard unless it was clearly unreasonable. (*People v. Casazza* (1991), 144 Ill. 2d 414, 417-18.) Whether a consent to search was voluntary depends on the totality of the circumstances. (*Casazza*, 144 Ill. 2d at 417.) Consent is voluntary if the person was not under any actual or implied duress or coercion. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 227, 36 L. Ed. 2d 854, 863, 93 S. Ct. 2041, 2048.

■ The trial court emphasized that Officer Coduto was mistaken in his belief that he could have brought in the narcotics detector dog. This finding was the basis of the trial court's ruling. If the officers could have brought in the dog, the determination of whether Karl's consent was voluntary would be different. "If the police have actual grounds to carry out a threatened course of conduct, communicating their intent amounts to no more than informing defendant of his legal status and does not vitiate consent." (*People v. Price* (1990), 195 Ill. App. 3d 701, 708; see also *People v. Coles* (1991), 217 Ill. App. 3d 1079, 1085.) Thus, we must determine whether the police had actual grounds to bring in a drug-sniffing dog.

■ We begin our analysis with the United States Supreme Court's opinion in *United States v. Place* (1983), 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637. In *Place,* the Supreme Court held that exposure of luggage in an airport to a canine sniff "did not constitute a 'search' within the meaning of the Fourth Amendment" because the sniff "does not expose noncontraband items that

otherwise would remain hidden from public view," and it "discloses only the presence or absence of narcotics, a contraband item." (*Place*, 462 U.S. at 707, 77 L. Ed. 2d at 121, 103 S. Ct. at 2644-45.) The Court elaborated on the nature of the fourth amendment right to be free of unreasonable searches in *United States v. Jacobsen* (1984), 466 U.S. 109, 80 L. Ed. 2d 85, 104 S. Ct. 1652. In that case, the Court held that there is no legitimate interest in privately possessing contraband, and, therefore, any police investigatory tool, such as a canine sniff, which reveals only whether contraband is present, is not a "search" within the meaning of the fourth amendment. *Jacobsen*, 466 U.S. at 123-24, 80 L. Ed. 2d at 100-01, 104 S. Ct. at 1661-62.

The *Place/Jacobsen* rationale applies to canine sniffs in other contexts. In *State v. Slowikowski*, the Oregon Court of Appeals ruled that a canine sniff of the exterior of a self-storage unit was not a search. (*State v. Slowikowski* (1987), 87 Or. App. 677, 685, 743 P.2d 1126, 1131.) Although one Federal case, *United States v. Thomas* (2d Cir. 1985), 757 F.2d 1359, 1367, held to the contrary, that a canine sniff of the exterior of an apartment was a search because of the "heightened privacy interest" in a dwelling, the *Thomas* holding has been questioned (see *People v. Dunn* (1990), 77 N.Y.2d 19, 23, 564 N.E.2d 1054, 1057, 563 N.Y.S.2d 388, 390 ("The distinction [*Thomas*] relies upon, namely, the heightened expectation of privacy that a person has in his residence, is irrelevant under *Place*'s rationale"); see also *United States v. Colyer* (D.C. Cir. 1989), 878 F.2d 469). According to *Dunn*, the *Place/Jacobsen* rationale applies to a canine sniff of a residence. *Dunn*, 77 N.Y.2d at 24, 564 N.E.2d at 1057, 563 N.Y.S.2d at 391.

We note that some courts have expressed concern about extending this rule to private residences and have sought to temper it by imposing a requirement that the use of the " 'canine cannabis connoisseurs' " (*Dunn*, 77 N.Y.2d at 21, 564 N.E.2d at 1055, 563 N.Y.S.2d at 389, quoting 1 LaFave, Search & Seizure §2.2(f), at 367 (2d ed. 1987)) be "reasonable" (*United States v. Taylor* (9th Cir. 1991), 934 F.2d 218, 221) or supported by a reasonable suspicion that contraband is present (*McGahan v. State* (Alaska 1991), 807 P.2d 506, 509-10; *United States v. Whitehead* (4th Cir. 1988), 849 F.2d 849, 857). We need not digress here into the parameters of a permissible canine sniff in a private home, as the officer here had probable cause to believe that there was marijuana in the living room. See *People v. Montgomery* (1986), 112 Ill. 2d 517, 525 (probable cause exists when the totality of the circumstances is such that

a reasonably prudent person would believe that the suspect is committing or has committed a crime).

■■ Applying the *Place/Jacobsen* rationale to the present facts, the police had a right to be in defendants' living room because they were executing an arrest warrant and defendant needed to put on more clothing. (See *People v. Hawkins* (1980), 88 Ill. App. 3d 178, 184-85; *People v. Mancl* (1977), 55 Ill. App. 3d 41, 44.) Since a canine sniff does not constitute a search, and the police had probable cause to believe there was marijuana in the living room, the police could have brought in the dog. Therefore, merely advising Karl of that fact does not serve to vitiate his consent. *Price*, 195 Ill. App. 3d at 708.

Moreover, the evidence does not support the trial court's conclusion that the police hounded Karl into showing them the plants in the closet. Officer Coduto asked Karl where was "the pot" or "any other drugs"; he did not ask where were the Cannabis sativa plants. The presence of the recently smoked marijuana indicated to the police officers that there probably was more marijuana nearby. Marijuana is the "dried leaves and flowering tops" of the Cannabis sativa plant. (Webster's Ninth New Collegiate Dictionary 727 (1987).) Thus, the officer did not request or command Karl to show him any plants. (We cannot, however, determine whether drug detector dogs are trained to identify Cannabis sativa plants, as opposed to the processed product, marijuana (see 1 LaFave, Search & Seizure §2.2(f), at 366 n.198 (2d ed. 1987)) and, consequently, whether the police officer intended to bring the dog in solely to sniff for marijuana.) We conclude that the trial court's finding that Karl's consent to the search was not voluntary was manifestly erroneous.

Accordingly, the judgment of the circuit court of Boone County is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

INGLIS, P.J., and GEIGER, J., concur.