THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD BAILEY, Defendant-Appellant.

First District (2nd Division)   No. 1—94—2903

Opinion filed June 13, 1995.

432

Ettinger & Pechter, Ltd., of Palos Hills, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Cho, and Adam Monreal, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

After a stipulated bench trial before Judge Stuart Palmer, defendant Richard Bailey was found guilty of armed violence, cannabis trafficking, and possession of cannabis with the intent to deliver, and was sentenced to six years' imprisonment and fined $36,050. He now appeals, claiming that his consent to the search of his luggage was not voluntary; rather, that it was solely the result of a coercive, misleading, and legally insupportable threat by a law enforcement official to detain and subject defendant's luggage to a narcotics detector canine sniff. We agree, and we therefore reverse.

During the hearing before Judge Deborah M. Dooling on defendant's motion to quash arrest and suppress evidence, DEA Agent Gary Boirtlein (Boirtlein) testified that he received a "tip" from a fellow drug task force agent in Texas, indicating that on November 3, 1993, a male passenger traveling under the name of "Keith Ericson" had boarded an Amtrak train in Austin, Texas, with a final destination of Milwaukee, and a transfer of trains the following day at Union Station, Chicago. The day prior to his departure the passenger had purchased his ticket for $378 in cash and had been assigned to a handicap compartment, although not handicapped himself. The tip also included a description of the passenger, later identified as defendant, and the two bags he was carrying.

On November 4, 1993, Agent Boirtlein met two other officers at Union Station and observed defendant alight from his train with two bags, "scan[ ]" the area, and proceed into the terminal where he paced around while "twitch[ing]" his head and "open[ing] up [his eyes] in an exaggerated fashion" before proceeding to the Amtrak ticket counter and eventually settling in a seating area. There, the agent, accompanied by one of the other officers, approached defendant, identified himself as a Federal drug task force agent, and asked if defendant would answer a few questions. Defendant did not object, but throughout the questioning appeared very nervous; his hands were shaking, and his "whole body was trembling."

When asked to do so, defendant showed the agent his ticket and his driver's license and explained that the names on the two did not correspond since he was traveling under an alias in order to "hid[e]

out from [his] wife." Thereafter, the agent told defendant that he was not under arrest and was free to leave at any time. Defendant agreed to answer more questions, but indicated that he was having difficulty hearing out of his left ear, so the agent spoke louder and more toward his right ear. Upon answering a few more questions about his bags, *i.e.*, that he owned them and knew what they contained, the agent repeated that defendant was free to leave, and then asked for consent to search his bags. Defendant refused to consent.

At this point, although telling him that he was still free to leave, Agent Boirtlein further advised defendant that if he refused to consent to the search of his bags, they would be detained and subject to a scent check by a narcotics detector dog on the premises; if the scent check was positive, a search warrant would be obtained for defendant's bags, but if it was negative, the bags would be returned to him as soon as possible. According to the agent, defendant responded to this advisement by "tak[ing] a deep breath and [saying] well go ahead and look[,] [y]ou are going to find it anyway." Thereafter, the agent searched defendant's bags and discovered a pistol and a bundle of gray duct tape that was later determined to contain cannabis.

Defendant's testimony tracked that of the agent; however, he stated that after being advised that his bags were going to be detained, he "didn't know what to do[, so he] kicked [his] bag out"; that he had purchased a two week round trip ticket; and that the agent had ripped the ticket when defendant gave it to him.

■ One exception to the procedural protections of the fourth amendment is the consent search, which occurs when a person voluntarily consents to a search. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 227, 36 L. Ed. 2d 854, 862-63, 93 S. Ct. 2041, 2047-48.) The State bears the burden to prove that such consent was freely given and not the result of duress or coercion. (*People v. Kessler* (1986), 147 Ill. App. 3d 237, 240, 497 N.E.2d 1323.) A trial court's ruling that the State has met its burden will not be reversed unless manifestly erroneous. *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766.

■ In the case at bar, whether defendant's consent was freely given depends in large part on whether Agent Boirtlein had actual grounds upon which to carry out his threat to subject defendant's bags to a canine sniff. (*People v. Price* (1990), 195 Ill. App. 3d 701, 708, 552 N.E.2d 1200; see also *People v. Guenther* (1992), 225 Ill. App. 3d

574, 578, 588 N.E.2d 346 (before concluding that defendant's consent was voluntary under the totality of the circumstances, the court first determined that the officer could have legally carried out his threat to subject the defendant's bags to a canine sniff).) In *United States v. Place* (1983), 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637, it was held that a brief detention of luggage for the purposes of investigation, including a canine sniff, does not constitute a search for fourth amendment purposes and need only be supported by a reasonable suspicion based on specific facts that the luggage contained contraband. However, facts justifying such an investigatory detention may not merely describe "a very large category of presumably innocent travelers, who would be subject to virtually random seizures." (*Reid v. Georgia* (1980), 448 U.S. 438, 441, 65 L. Ed. 2d 890, 894, 100 S. Ct. 2752, 2754.) As with the determination of whether consent was freely given, the court employs the totality of the circumstances test to determine whether a reasonable, articulable suspicion existed to justify an investigatory detention of luggage. *United States v. Sokolow* (1989), 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581.

Defendant cites a number of cases for his contention that Agent Boirtlein did not have the grounds upon which to carry out his threat to detain defendant's bags, the most persuasive of which is *People v. Breeding* (1991), 219 Ill. App. 3d 590, 579 N.E.2d 1128. There, the defendant's tote bag was detained based on the following information: The defendant's train had originated from a city which was a "source" for narcotics, she was among the last persons to exit the train, and she walked slowly as she scanned the crowd. Then, she made eye contact with an individual who nodded his headed sharply to the right and subsequently joined her. The defendant handed her tote bag to the individual and exclaimed: " 'These have been the longest two days of my life.' " (*Breeding*, 219 Ill. App. 3d at 592.) The individual noticed the officers following them, nudged the defendant, and placed his index finger against his lips. Thereafter, the defendant turned pale, had difficulty removing a cigarette from the pack, and attempted to light it four times before succeeding. When confronted, she told the officers that she had lost her train ticket and that her name was "Brown"; however, the defendant's luggage and driver's license identified her as "Breeding." *Breeding*, 219 Ill. App. 3d at 595-96.

In holding that the detention of the defendant's tote bag was improper, the court concluded that (1) the absence of a train ticket was of no particular significance as the defendant was at the end of her trip; (2) scanning the crowd when she alighted from the train was not unusual; (3) the individual's "gesture of common courtesy" of

taking the defendant's tote bag was "hardly suspicious"; (4) nervousness is not uncommon when being followed by two men; (5) the defendant's statement regarding her long trip was not suspicious in light of her two-day cross-country train ride; and (6) the context in which the individual pressed his index finger to his lips was "susceptible of an innocent interpretation." (*Breeding*, 219 Ill. App. 3d at 600.) The court also placed great import on there being no claim that the defendant ever made any untruthful statements to the police; and since the State did not make a claim to the contrary, the court presumed that the defendant answered truthfully when she explained to the officers that her maiden name was "Brown." *Breeding*, 219 Ill. App. 3d at 600-01.

■ Here, defendant's actions were no more "suspicious" than the defendant's in *Breeding*; in fact, they were less suspicious. Defendant did not meet with anyone at Union Station who silenced him upon noticing that they were being followed, and he traveled conspicuously in a handicap compartment. Further, as in *Breeding*, the State makes no claim that defendant lied when stating that he was traveling under an alias to prevent his ex-wife from becoming aware of his travels—an explanation for traveling "anonymously" that most people would agree happens to be not uncommon. The two cases cited below further demonstrate that defendant's actions do not support a reasonable, articulable suspicion that his bags contained contraband.

In *People v. Boyd* (1991), 215 Ill. App. 3d 894, 576 N.E.2d 116, the defendant's luggage was detained after he purchased a one-way ticket in cash, boarded the train in a "source" city, occupied a sleeping compartment, appeared nervous, could not produce his ticket, and responded, when interrogated, that his point of origin was Los Angeles even though he had boarded the train in Flagstaff. The court reasoned, as we reason here, that all of the defendant's actions could have been easily characterized as the actions of an innocent traveller in an unfamiliar environment. *Boyd*, 215 Ill. App. 3d at 899-900.

In *People v. Sherman* (1989), 190 Ill. App. 3d 814, 547 N.E.2d 476, the State contended that it had a reasonable, articulable suspicion that the defendant's luggage contained narcotics since (1) the defendant and his companion occupied a compartment on the train paid for in cash under a fictitious name; (2) the call-back number they had left when purchasing their tickets was that of a hotel at which no one matching the alias was registered; (3) the two traveled from a "source" city; and (4) upon alighting from their train they walked separately. All but the last factor was supplied by a "tip" from an Amtrak police officer. The court rejected the State's argument, stating that the testimony regarding the actions of the defendant and his

companion in the terminal was insufficient to establish a reasonable, articulable suspicion that the defendant was carrying narcotics since the facts merely showed that the defendant wished to travel anonymously. *Sherman,* 190 Ill. App. 3d at 816-17.

The State here contends that the "tip" from the agent in Texas regarding defendant distinguishes this case from the authority defendant cites. "In executing a search or seizure a police officer may properly rely on information obtained from other police officers, even if he is personally unaware of the underlying facts." (*Price,* 195 Ill. App. 3d at 709; see also 2 W. LaFave, Search & Seizure § 3.5(b) (2d ed. 1987) (condoning reliance on communication between law enforcement officials from differing States, but later suggesting that a challenge to underlying facts of communication may require proving them).) In *Price,* though, the detaining officer was informed by a fellow officer that defendant "would be returning to Chicago with an indeterminate amount of cocaine." (*Price,* 195 Ill. App. 3d at 704, 708-09.) The tip, here, was not incriminating; rather, it was comprised of wholly innocent facts, *i.e.,* that a person matching defendant's description paid cash for his round trip ticket using the name of "Keith Ericson," stayed in a handicap compartment, had two carry-on bags, boarded the train in Texas, and would be catching a connecting train in Chicago. The presence of contraband on the person described or in his baggage was not part of the information conveyed by the tipster.

Furthermore, the State fails to analogize convincingly the facts of the instant case to those of a case holding that reasonable, articulable facts existed to justify an investigatory detention of a person's bags. *Breeding* may contain the reason for this failure, for there, after analyzing numerous cases dealing with the propriety of investigatory detentions of luggage, the court stated:

> "We have found no case which upholds a seizure of luggage solely on the basis of the mannerisms of the defendant which are accompanied by truthful answers or other innocent behavior. We note that in the seminal case of *United States v. Place* the Supreme Court held that the agents had properly seized the luggage but detained it for an unreasonable period of time. Among the factors considered in support of the seizure were tags on the luggage which contained non-existent addresses *and false information the defendant gave the agents.*" (Emphasis in original.) *Breeding,* 219 Ill. App. 3d at 601.

Accordingly, we hold that a reasonable, articulable suspicion that defendant's bags contained contraband did not exist upon which Agent Boirtlein could have legally carried out his threat to subject defendant's bags to an investigatory detention, and while such a de-

termination does not necessarily lead to the conclusion that defendant's consent in the face of that threat was not voluntary under the totality of the circumstances, no countervailing circumstances exist to compel any other conclusion.

In *People v. Cardenas* (1992), 237 Ill. App. 3d 584, 604 N.E.2d 953, the police asked the defendant whether they could search her car for drugs, and she responded: " '[N]o, is that legal?' " The officer replied that it was legal, that they did it all the time, and handed the defendant a consent form, which she signed. The court held that under the totality of the circumstances the defendant's initial refusal to consent to a search of her vehicle, combined with the officer's misleading, false, and coercive response to the defendant's question as to whether such an on-the-spot search was legal, invalidated the consent. (*Cardenas*, 237 Ill. App. 3d at 585-89; see also *People v. Manke* (1989), 181 Ill. App. 3d 374, 537 N.E.2d 13 (court upheld a suppression order where the defendant, initially arrested for trespass, consented to the search of his car only after an officer threatened to impound the defendant's car and obtain a search warrant; a search incident to an arrest for trespass did not support the officer's threat).) Similarly, here, defendant's initial refusal to consent to the search of his bags, combined with the agent's legally insupportable threat to detain those bags, invalidated defendant's consent.

Those cases that appear to place little import on the effect of police threats or "advisements" on the voluntariness of a defendant's consent are distinguishable. See *People v. Magby* (1967), 37 Ill. 2d 197, 226 N.E.2d 33 (police threatened to obtain a search warrant if defendant refused to consent to search and, without analyzing whether police could have legally carried out that threat, the court determined that there was sufficient evidence of consent); *People v. Paull* (1988), 176 Ill. App. 3d 960, 531 N.E.2d 1008 (the court concluded that consent given by defendant's girlfriend was voluntary without analyzing whether probable cause existed to support statements by police that, if she refused, they would get a search warrant and it would look bad for her boyfriend); *People v. Holliday* (1983), 115 Ill. App. 3d 141, 450 N.E.2d 355 (court held consent was valid without analyzing whether officer could have legally carried out threat to procure a search warrant); *People v. Griffin* (1977), 53 Ill. App. 3d 294, 368 N.E.2d 738 (same); *People v. Zynda* (1977), 53 Ill. App. 3d 794, 368 N.E.2d 1079 (the defendant's consent held valid where police told him that things would go easier on him if he permitted the search).

In *Bumper v. North Carolina* (1968), 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788, the Court found the situation "instinct with coer-

cion" where the police elicited the defendant's elderly grandmother's consent by telling her that they had a warrant in hand, when they did not. According to the Court, the grandmother had responded only out of a belief of the inevitability rather than out of a free decision to allow the search. This same belief of inevitability is present when the police, seeking consent to search, threaten to detain one's bags.

Here, Agent Boirtlein's threat that he intended to detain defendant's bags falsely implied that he could do so legally; thus, from that point on, defendant was constrained to labor under "an erroneous belief" that he could not protect his privacy by refusing to give consent. (See 3 W. LaFave, Search & Seizure § 8.2(c), at 187-88 (2d ed. 1987) (a legally insupportable "threat to obtain a warrant conveys to the individual the erroneous belief that he cannot protect his privacy by refusing to give consent").) No matter how defendant responded to the threat, the agent was going to take his bags from him. Consequently, we conclude that the agent's threat was "instinct with coercion"; therefore, defendant's consent can in no way be characterized as voluntary.

■ Defendant also urges this court to adopt a bright line test where a person's initial refusal to consent should be deemed to bar any further requests by law enforcement officials for that consent. He analogizes the refusal to consent to the refusal to submit to interrogation: Just as law enforcement officials must cease to interrogate a "Mirandized" person once that person asserts his right not to be questioned further (*People v. R.C.* (1985), 108 Ill. 2d 349, 353, 483 N.E.2d 1241), law enforcement officials, defendant urges, should be prohibited from making further requests for consent once a person exercises his constitutional right to refuse it.

However, while an initial refusal to consent is an important factor in assessing whether a subsequent consent is voluntary, a prior refusal does not necessarily cause a subsequent consent to be involuntary. See *Cardenas*, 237 Ill. App. 3d at 587-88 (citing various authorities).

For the foregoing reasons, we reverse the judgment of the trial court.

Reversed.

DiVITO and McCORMICK, JJ., concur.