[No. C015878. Third Dist. July 20, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
ALAN ROY LINK, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication except for parts A and C of the Facts and parts I, II, and III of the Discussion.

**COUNSEL**

Victor D. Vertner for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General,

Margaret Garnard Venguri and Janett H. Shaw, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DAVIS, Acting P. J.**—After the trial court denied his suppression motion, defendant pled no contest to charges of drug and firearm possession. (Health & Saf. Code, §§ 11055, subd. (d)(2), 11377; Pen. Code, § 12021, subd. (a).) The court granted probation with the condition that defendant serve a nine-month jail term (which was stayed pending appeal). Defendant renews his efforts to quash the search warrants and to suppress evidence. We shall affirm.

### FACTS

At the hearing on the defendant's motion, the court received the testimony of several witnesses, and the parties placed in evidence the two search warrants involved in the case and their supporting documentation. As the defendant does not renew on appeal his effort to traverse the search warrants, the testimony we recount in the unpublished section of these facts is primarily limited to the facts preceding the execution of the first search warrant, while the published section details the facts leading up to the second search warrant.

### A.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B.

On October 23, 1991, law enforcement authorities executed the first search warrant at approximately 9 a.m. Agent Power and Detective Betts assumed responsibility for "structure #1"; Officer Schrader, Deputy Torongo, and a couple of additional personnel were to secure the perimeter without entering any other structures.

When Officer Schrader went to secure "structure #2," he realized it was a residence. Through the sliding glass doors, he could see the defendant inside in bed. Officer Schrader motioned to Deputy Torongo to help him secure the premises. With guns drawn, they ordered the defendant out of bed and handcuffed him. Officer Schrader took possession of a rifle lying in a case

---

*See footnote 1, *ante*, page 1272.

near the bed. He then searched the home for other persons, after which he rapidly looked through the drawers of the defendant's rolltop desk for weapons, removing a couple of billy clubs. At some point, he found a handgun. He testified at the hearing he did not notice any contraband or paraphernalia while searching.

After a few minutes, Deputy Torongo took the defendant to the Siders residence. About 10:45 a.m., Detective Betts came to question the defendant, who was still handcuffed. After advising the defendant of his rights, the detective obtained the information that the defendant was a convicted felon who had prior arrests for narcotics. During the course of this interview, the detective sought (in an abundance of caution) to obtain the defendant's consent to search his residence. Since we do not reach the issue of consent, we need not detail the circumstances of this interview other than to note the trial court found that the defendant, after vacillating, authorized the search of his vehicle and his residence (with the exception of his desk). However, he later refused to sign a consent form.

After the interview, the defendant volunteered to Deputy Torongo that he was concerned a search would reveal the location of his stash. When she asked what he meant, he said he had about two grams of crank in his residence. The deputy reported this conversation to Detective Betts, who attempted to persuade the defendant to allow him to search the desk (in the process explaining he would in any event try to obtain a search warrant for it). The defendant repeatedly declined, expressing the concern he would go to jail for possessing drugs that were strictly for his personal use.

Detective Betts arrested the defendant (listing the time as 1 p.m.) on suspicion of drug possession and for being a felon in possession of a firearm.[5] He phoned for a patrol unit to transport the defendant to jail, as all personnel present were fully occupied with searching, processing property seized, and supervising the residents. He was told one would be sent as soon as it was available, since all were busy. He eventually dispatched one of the forest service officers to take the defendant and Mr. Siders to meet the patrol car part way. The driving time from the property to the jail was about 90 minutes; the defendant was booked at 4 p.m.

Having concluded his efforts at persuasion might vitiate any consent ultimately achieved, Detective Betts decided to obtain a warrant to search the desk. However, he resolved to seize the desk and return with it before

---

[5]After a conversation with his sergeant, Detective Betts called the jail at 9 p.m. to release the defendant on the drug possession charges, since they did not believe they had sufficient cause to arrest him before searching the desk.

obtaining a warrant, rather than searching it on the scene. They removed the top section from the drawers and transported it to headquarters.

The detective based this choice on several factors. First, his main priority was to complete the search of the Siders residence and the in-law's home, since the weather was changeable and cold and the residents (who included an elderly woman, a disabled brother of Mr. Siders, and two small children) were being detained outside until the searches of these homes were completed, which was not accomplished until 5 p.m. Second, he did not have sufficient personnel to dispatch himself or someone else to obtain a written search warrant. He also rejected the idea of a telephonic search warrant—which would require a lengthy three-way conversation between himself, a magistrate, and the district attorney—as impracticable: there was no standard phone service on the property, the nearest pay phone was nine miles away over a rough road (about one hour in travel time), and the cellular phones functioned only intermittently. Third, he and the other personnel present were fully busy processing all the items seized from both residences and elsewhere until well into the evening (a process lengthened by the limited lighting available from flashlights and headlights).[6] This was not completed until 10 p.m.[7] If law enforcement personnel were to remain to secure the desk until he now began the process of obtaining a warrant (which he estimated from experience as six hours), the return of the defendant and Mr. Siders could place already tired officers in a possibly hazardous situation[8] at a distant unfamiliar location after working nearly twenty-four hours without anything to eat.

Detective Betts began preparing a warrant to search the desk the next day (the 24th). However, the press of business prevented him from completing the application until the 25th. He brought it before a magistrate at 3 p.m. on that day. Inside the desk, a search revealed notes on the manufacture of methamphetamine, a syringe partially loaded with methamphetamine in solution, and two grams of the substance.

C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[6]At the hearing, the various witnesses acknowledged the defendant's residence had generator-powered lighting of which they made use, but claimed it was inadequate and needed to be supplemented by the headlights and flashlights.

[7]In the second warrant, Detective Betts listed a completion time of 11:30 p.m., which actually reflected the time by which they had returned to headquarters and completed the necessary procedures.

[8]At the hearing, Detective Betts elaborated that he had seen (unspecified) items leading to a concern the defendant might be affiliated with Hell's Angels.

*See footnote 1, *ante*, page 1272.

DISCUSSION

I.-III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV.   *Seizure of defendant's desk*

A.   *Initial seizure*

█    As the defendant recognizes, law enforcement officers are entitled to seize property pending issuance of a search warrant if they have probable cause to believe it contains contraband and the exigencies of the circumstances so demand. (*United States* v. *Place* (1983) 462 U.S. 696, 701 [77 L.Ed.2d. 110, 116-117, 103 S.Ct. 2637].) The defendant challenges the exigencies under which the officers removed the desk from the property pending issuance of the second search warrant.

The trial court cited "the location, persons present at the scene, communication difficulties, and lateness of the hour" as the exigencies justifying seizure of the desk. Although defendant prefers to view the evidence otherwise, these are all valid. The officers were occupied with processing the evidence from the Siders residence until nearly 10 p.m. and could not spare personnel to attend to obtaining a search warrant.[14] The trial court found credible the testimony that a *lengthy* call over the cellular phone such as that required for a telephonic search warrant was impracticable. (While the defendant notes the officers placed other calls, he overlooks the brevity of them.) Defendant and Mr. Siders were free to return to the property later in the evening, so if the desk were left in defendant's residence the officers would be placed in the situation of standing guard over it against an unknown number of possible assailants in a remote location to which reinforcements would be difficult to dispatch.[15] The court impliedly credited the testimony that it would take several additional hours to prepare a written search warrant, which would require these officers to stand guard well into the early hours of the morning without rest. These were adequate exigencies warranting the seizure of the desk.

---

*See footnote 1, *ante*, page 1272.

[14]It is curious the defendant believes the testimony relating to his transportation to jail undermines the assertion of a shortage of personnel. The testimony specifically noted the difficulty of obtaining a patrol unit because all were busy, and the need to send one of the few people present out to meet the patrol car with the defendant. As we see it, this reinforces the shortage of personnel at the site and the inability to summon additional assistance.

[15]Moreover, it is difficult to believe defendant would seriously find it a lesser intrusion to have a phalanx of armed officers on his property instead of the "deprivation of his possessory interest" in the desk.

### B. *Delay in obtaining warrant*

■  Defendant argues that *United States* v. *Van Leeuwen* (1970) 397 U.S. 249 [25 L.Ed.2d 282, 90 S.Ct. 1029] established a limit of 29 hours for the length of time property can be seized before officers must obtain a warrant to search it (as least under the interpretation of *Van Leeuwen* given by *U. S.* v. *Dass* (9th Cir. 1988) 849 F.2d 414 via *United States* v. *Hillison* (9th Cir. 1984) 733 F.2d 692). Since more than 29 hours passed between the seizure of his desk and the issuance of the second search warrant, defendant claims a violation of the Fourth Amendment.

In *Van Leeuwen*, Washington postal officials became suspicious of two parcels deposited for delivery to locations in California and Tennessee. (397 U.S. 249 [25 L.Ed.2d 282].) They obtained information about the California address within a couple of hours that gave rise to probable cause to search the parcel. (*Id.* at pp. 250, 252 [25 L.Ed.2d at p. 285].) However, the time difference prevented them from reaching Tennessee officials until the following day, at which point they obtained information giving rise to probable cause to search the second parcel as well. (*Id.* at p. 250 [25 L.Ed.2d at p. 284].) At that point they expeditiously obtained a warrant, opened and resealed the packages, and sent them on their way. (*Ibid.*) After noting, "No interest protected by the Fourth Amendment was invaded by forwarding the packages the following day rather than the day when they were deposited" (*id.* at p. 253 [25 L.Ed.2d at p. 286]),[16] the Supreme Court held only that ". . . a 29-hour delay between the [deposit of the parcels] and the service of the warrant cannot be said to be 'unreasonable' within the meaning of the Fourth Amendment." (*Ibid.*)

In *Hillison*, the Ninth Circuit interpreted *Van Leeuwen* as holding that a brief detention of mail without probable cause does not violate any Fourth Amendment interest (either of privacy or possession), and that once probable cause arises a period as long as 29 hours is still reasonable; the 9-hour retention of a parcel was consequently legal. (733 F.2d at pp. 695-696 & fn. 1.) In *Dass*, officers detained a large number of packages (that had stimulated responses from a narcotic detector dog) for periods of nine to twenty-three days before obtaining warrants. (849 F.2d 414.) The majority in this later Ninth Circuit panel—with no explicit support in the express language of the earlier opinion—concluded *Hillison* had interpreted *Van Leeuwen* as creating an "outer limit" of 29 hours; since this period was far exceeded on the facts before it, the *Dass* majority agreed the evidence obtained had to be suppressed. (*Id.* at p. 415.)

---

[16]This protestation notwithstanding, there is a sub silentio conclusion that at some point the possessory interest of the depositor of the mail is invaded by an extensive delay, otherwise there would be no basis for suppression.

We find that *Van Leeuwen* does not require suppression of the contents of the desk.[17] Although we agree that the presence of probable cause does not entitle the executive to seize property *indefinitely* before obtaining a magistrate's review of the legality of the seizure (*United States* v. *Dass, supra,* 849 F.2d at p. 416), we do not agree with the *Dass* majority that there is anything in the prior two cases suggesting twenty-nine hours is the bounds of reason. Indeed, to compare warrantless probable cause seizure of property with warrantless probable cause seizure of a person (i.e., an arrest), a delay of up to 48 hours should be tolerable (if otherwise justified under the circumstances) in obtaining a search warrant for the seized item. (*County of Riverside* v. *McLaughlin* (1991) 500 U.S. 44, 56 [114 L.Ed.2d 49, 63, 111 S.Ct. 1661]; *Gerstein* v. *Pugh* (1975) 420 U.S. 103, 114 [43 L.Ed.2d 54, 65, 95 S.Ct. 854].) Surely if one must endure the more egregious seizure of one's *person* for 48 hours before obtaining a magistrate's review of the legality of a warrantless arrest, the seizure of one's *property* for an equivalent period cannot offend constitutional principles if the delay is reasonably justifiable.[18]

The warrantless seizure in the present case was a little more than two days and otherwise was reasonable under the circumstances. Nothing could be done with the desk on the day it was initially seized (which was the reason *for* it being seized); the testimony established that the officer began to prepare the second warrant application on the following day (the 24th), but could not complete it because of press of business until the 25th, at which point he expeditiously obtained the warrant and conducted the search. No basis for exclusion of the evidence from the desk exists.

### DISPOSITION

The judgment is affirmed.

Scotland, J., and Nicholson, J.

Appellant's petition for review by the Supreme Court was denied November 16, 1994.

---

[17]The mail cases and the present case are not exactly aligned. The mail cases assert that no Fourth Amendment interest is involved; here, on the other hand, the defendant's possessory interest in his property *was* invaded when his desk was removed. However, this distinction is not developed by the parties and we shall not pursue it *sua sponte.*

[18]Moreover, this rough equivalency is not ironclad. In the case of property, temporary seizures are constitutionally permissible for roughly two days; however, this may be longer where justified by the totality of known facts and circumstances. A court must bear in mind these decisions must not be constrained rigidly by mathematical formulae conceived in the abstract far removed by time and distance from real world dangers and conditions.